RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DENNIS IMWALLE,

    *Plaintiff-Appellee,*

  *v.*

RELIANCE MEDICAL PRODUCTS, INC. et al.,
    *Defendants-Appellants.*

No. 06-4619

>

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 04-00275—Herman J. Weber, District Judge.

Argued: October 30, 2007

Decided and Filed: February 8, 2008

Before: DAUGHTREY and GILMAN, Circuit Judges; EDMUNDS, District Judge.[*]

---

## COUNSEL

**ARGUED:** Mark J. Stepaniak, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellants. George M. Reul, Jr., FREKING & BETZ, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Mark J. Stepaniak, Doreen Canton, Rachel S. Zahniser, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, for Appellants. George M. Reul, Jr., Randolph H. Freking, FREKING & BETZ, Cincinnati, Ohio, for Appellee.

---

## OPINION

---

  RONALD LEE GILMAN, Circuit Judge. Dennis Imwalle became President of Reliance Medical Products, Inc. in 1990. He was fired in January of 2004, three months after he filed a charge with the Equal Employment Opportunity Commission (EEOC) that alleged both age and national-origin discrimination. He was 62 years old at the time his employment ended. Imwalle's suit in the district court resulted in a $185,000 jury verdict for compensatory damages based on his claim that he was fired in retaliation for filing his discrimination claims. The court subsequently awarded him approximately $250,000 more in attorney fees, costs, and prejudgment interest.

---

[*] The Honorable Nancy G. Edmunds, United States District Judge for the Eastern District of Michigan, sitting by designation.

Reliance and its affiliated companies have appealed, challenging both the district court's denial of their motion for judgment as a matter of law and the amount of the award for attorney fees and costs. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.        The Haag-Streit companies

Haag-Streit Holding AG (HSH AG) is a holding company based in Bern, Switzerland that has 18 subsidiaries located in the United States and throughout Europe. The Haag-Streit companies are providers of medical instruments and equipment for ophthalmologists, optometrists, and opticians. HSH AG acquired Reliance, a company based in Mason, Ohio, in 1988. Ten years later, HSH AG consolidated all of its U.S. operations, including Reliance, under Haag-Streit Holding US, Inc. (HSH US). HSH AG's U.S.-based distribution companies—including Moeller Microsurgical, Inc. (Moeller), Haag-Streit Service, Inc., Clement Clarke, Inc., and Interzeag, Inc.—were consolidated at that time to form Haag-Streit USA, Inc. (HS USA), a subsidiary of HSH US that is also located in Mason. Reliance was not included in that consolidation. As a result, Reliance and HS USA are each a direct subsidiary of HSH US. All of the defendants are hereafter collectively referred to as "Haag-Streit."

### B.        The individual parties

Imwalle, a U.S. citizen who was born on August 7, 1941, was hired as President of Reliance in May of 1990. His employment agreement automatically renewed each year in the absence of any proper notice to the contrary. In July of 1999, Imwalle also became President of HSH US, Reliance's parent company, and, a month later, was named Vice President (VP) and Chief Operating Officer (COO) of HS USA. Prior to 1999, Imwalle had no role in any of the Haag-Street companies other than Reliance. He continued to serve as President of Reliance at all times relevant to this lawsuit.

Throughout his employment, Imwalle reported to Walter Inabnit, a Swiss national who was chairman of HSH AG, HSH US, HS USA, and Reliance, and who also served as President of HS USA. Rene Ott, also a Swiss national, became COO of HSH AG in April of 2000. In that capacity, Ott was responsible for the operations of all of HSH AG's subsidiaries and was Imwalle's immediate boss. Dominick Beck, a 38-year-old Swiss national, replaced Inabnit as President of HS USA in January of 2003. Thereafter, Imwalle no longer served as VP of HS USA, but he continued to hold the positions of President of Reliance, President of HSH US, and COO of HS USA.

### C.        Reliance's success under Imwalle

Imwalle testified that when he became President of Reliance in 1990, the company's facilities were "a dump," "production flow was terrible," and the company was "nothing" and a "nobody." Following Imwalle's arrival, the company built a 10,000 square-foot facility and obtained independent certification attesting to the company's compliance with international quality-management standards. Imwalle, Ott, Haag-Streit's independent auditor Richard Batterberry, and Haag-Streit's human resources director Roy Grandstaff all testified that Reliance operated on budget, doubled its sales, and saw profits increase while Imwalle was President.

Batterberry and Grandstaff also acknowledged that Reliance was "always profitable," "a very successful part of the business," and "very well controlled" while Imwalle was President. Grandstaff testified that 2003—Imwalle's last full year with Reliance—was the "highest volume sales year in the 100 plus year history of the company." Inabnit and Ott both said that they were satisfied with Imwalle's performance as President of Reliance.

Haag-Streit does not dispute the foregoing, but highlights the fact that Reliance saw its sales decline by 14% in the early months of 2001. Imwalle attributed the sales slump to a wider economic recession. Ott was dissatisfied with that explanation, however, and blamed Imwalle for failing to foresee the recession and minimize its effects on the company. But Ott acknowledged at trial that there was an "official recession in the United States" in March of 2001. He also testified that the decline in sales lasted until May of 2001, after which Reliance's sales and profits rebounded.

## D.    Moeller problems identified

Haag-Streit argues that Inabnit and Ott had a legitimate, nondiscriminatory reason for Imwalle's termination: poor performance by Imwalle, citing accounting and inventory problems at Moeller. Imwalle does not dispute Haag-Streit's contention that such problems plagued Moeller. Instead, he argues that this explanation was simply a pretext designed to mask retaliation for his complaints of discrimination. In support of his case, Imwalle introduced evidence to show that he was not responsible for Moeller's problems and that he in fact tried to fix them.

Moeller, a microscope-distribution company, was originally formed in New Jersey in 1992 as a distribution company for Moeller-Wedel, a German company. HS USA acquired the company in 1998 and made it a division. Moeller was in financial distress at the time of the acquisition and was "virtually bankrupt" within two years. In July of 1999, Inabnit and Imwalle met with the managing director of a HSH AG subsidiary in Germany to discuss a "major inventory/accounting problem" involving Moeller. According to HSH AG's independent auditor Batterberry, Moeller had "an enormous amount of obsolete inventory onsite that require[d] write offs of approximately $1.4 million." This problem was exacerbated by the fact that Moeller did not employ an accountant, had not established any inventory controls, and had no system to track inventory. Batterberry detailed Moeller's problems in a letter dated January 28, 2004 (just one day after Imwalle was terminated) as follows:

> The magnitude of the poor operating results of this division . . . is staggering for a business of its size. This continuing pattern of substantial losses is something that we very rarely see with our other audit clients. This history was certainly compounded by the magnitude of the adjustments needed in the past several years to adjust for prior years' inventory deficiencies. . . . While there were a number of issues, the major business problem always seemed to be the low volume of sales which never allowed the Moller [sic] division to break even on a financial basis. . . . As your auditors, we found it curious that so many difficult issues plagued the Moller Microscope division that were not found in other parts of the US operation. Except for the Moller Microscope division, we have found that [sic] internal controls to be generally effective, accounting systems to be functioning in a very acceptable manner, and personnel to be helpful to us as auditors and conscientious in performing their responsibilities.

The letter went on to explain that, in addition to the $1.4 million write-off, the continuing problems at Moeller could be traced to the way in which Moeller employees managed sales, purchasing, inventory tracking, and financial controls on a day-to-day basis.

Following the July 1999 meeting, Inabnit asked Imwalle to "dig in and review procedures" at Moeller. Batterberry confirmed that Imwalle and Dave Edenfield, the Chief Financial Officer (CFO) of HS USA, "were able to implement procedures and controls at the Moller [sic] division that were in effect at the other [Haag-Streit] US divisions . . . ." The Moeller problems persisted, however, and, in the spring of 2002, Inabnit told Imwalle that "he was very disappointed with the continuation of the Moeller inventory issues."

Inabnit and Ott repeatedly told Imwalle that he was responsible for the inventory problems at Moeller and they expressed frustration that the problems continued to plague the company. Although Inabnit and Ott repeatedly blamed Imwalle for the Moeller problems, Ott later testified that a prior VP of Sales was responsible for the "inventory mess." Batterberry, in his January 2004 letter, blamed the then-current VP of Sales, Ed Rae, and Moeller personnel generally, for careless management, while emphasizing Imwalle's and Edenfield's role in trying to solve the problems.

In June of 2002, Imwalle attended management meetings in Bern, Switzerland and recommended, along with others, that the Moeller division be closed. He testified that when he left the meeting, he thought that a consensus had been reached to close operations, only to learn later that Inabnit had overruled the decision. Thereafter, Imwalle says that he was excluded from meetings related to Moeller. Ott testified that Moeller was in fact eventually closed at the recommendation of HS USA President Beck, who told Ott that Moeller "did not fit into Haag-Streit USA's wholesale structure."

Haag-Streit introduced evidence that, from about 2000 to 2002, Inabnit and Ott continued to express frustration about the Moeller operation to Imwalle and blamed him for a variety of other system-wide problems, including personnel issues and dissatisfaction with public relations and new-product promotions. They also voiced concerns about the sales ledger being updated and Imwalle's calculation of his and his team's bonuses for 2000. Ott's and Inabnit's primary concern, however, remained the problems at Moeller.

### E.    Imwalle asked to resign

Haag-Streit claims that "[b]etween January and May 2003, Inabnit and Ott decided to terminate Imwalle for poor performance." It asserts that the decision was based on an accumulation of concerns, including the Moeller inventory problems. On May 7, 2003, Ott told Imwalle that Haag-Streit needed "a leadership change at the top" and asked Imwalle to sign a previously prepared resignation letter. The letter stated that, effective August 31, 2003, Imwalle would resign as President of HSH US, as COO of HS USA, and as President of Reliance.

According to Haag-Streit, Imwalle refused to sign the letter,"challeng[ing] Ott to fire him on the spot." Ott then "suggested that Imwalle could remain as President of Reliance at a greatly reduced salary and asked Imwalle to make him an offer." Imwalle told Ott that he wanted to see an attorney first, but that he would respond before May 23, 2003. The request for his resignation, Imwalle testified, took him by surprise:

> There were previous incidents, . . . especially the meeting in Berne [sic], the progressive moving me out of the management of Haag-Streit USA, the exclusion from the Moeller meetings. I wasn't allowed to go to the annual AAO meeting, which was in Orlando that year. And those kinds of signs give you notice of an approaching storm but you never know when it is going to hit, and I had no reprimand. I thought the first that would happen would be that.

On May 22, 2003, Imwalle's attorney sent a letter to Ott, claiming that Imwalle had been discriminated against on the basis of his age and referencing Imwalle's employment agreement. Ott said he was "very surprised" by the letter because he had not been aware that Haag-Streit had an employment contract with Imwalle. Haag-Streit acknowledges that Inabnit and Ott, upon learning of Imwalle's employment agreement, decided "to accept [Imwalle's] employment agreement and follow it '100 percent' by paying Imwalle through the end of the contract," even though they were aware that the agreement allowed for immediate termination.

Imwalle's contract was scheduled for renewal in June of 2004. Ott testified that he "didn't want to fire Imwalle [in May of 2003]. That was not the intention. I wanted to stabilize the

company." Ott explained that he and Inabnit "decided to allow Imwalle to continue working at Reliance for an indeterminate period of time to get some value in return for paying his salary under the employment agreement." As a result, Imwalle remained President of Reliance and retained his position with HSH US.

Imwalle and Ott both testified that, after May of 2003, Imwalle "continued to perform his job at Reliance as he had for the past 14 years." But Imwalle also testified that an "atmosphere of retaliation" existed in 2003, following his attorney's May 22 letter alleging age discrimination by Haag-Streit. He said that, after May of 2003, he "was more or less divorced from the activities at Moeller Microsurgical [and] Haag-Streit USA." Imwalle also claimed that he was excluded from meetings and that "key decisions" were made "without his input or knowledge." As an example of his exclusion, Imwalle cites Haag-Streit's decision in July or August of 2003 to finally close down the Moeller operation. Imwalle said that he was not involved in the decision, even though he was still COO of HS USA and President of HSH US at that time, and had previously recommended closing Moeller. Haag-Streit does not dispute Imwalle's lack of involvement in the decision.

On October 31, 2003, Imwalle filed a charge of age and national-origin discrimination with the EEOC. Imwalle points to several incidents involving Inabnit and Ott that allegedly reflect their biases against both elderly persons and Americans. In support of his claim of age discrimination, Imwalle testified, and Ott acknowledged, that at the 2002 management meeting in Bern, Switzerland, Ott suggested that Haag-Streit "[d]ismiss people (if possible elderly people)" as a way of addressing the company's financial problems. The "elderly people" comment appeared in the Powerpoint slide presentation that Ott gave at the Bern meeting.

Imwalle testified that he "was stunned" upon seeing that statement in Ott's presentation because "this dangerous situation applied to Haag-Streit USA, and I was the elderly COO of Haag-Streit USA and when the gun is pointed at you, you freeze. . . . I have never seen anything so disgusting." Imwalle was 61 years old at the time. Ott said that he and Imwalle later discussed Imwalle's concerns about dismissing elderly people, and that Imwalle told him that such action could violate U.S. employment laws. Ott explained that he "never understood why this [recommendation to dismiss elderly people] suddenly appears to be—this one line, in a huge presentation, suddenly appears as being such a big issue. I still have a problem with this."

Switzerland does not have age-discrimination laws, and Ott said that he "didn't know about at what age this laws [sic] [protecting against age discrimination] would apply. . . . And so I didn't know that this [recommendation] is illegal concerning Mr. Imwalle." Imwalle also testified that, at the May 7, 2003 meeting where he was asked to resign, Ott told Imwalle that "when I reach your age, I hope to retire and perform community work."

In support of his claim of national-origin discrimination, Imwalle alleged that Inabnit told him during a business trip in 1996 that his "biggest mistake was hiring an American manager [meaning plaintiff]. I will never make that mistake again." (Alternation in original.) Although Haag-Streit disputes this allegation, the district court observed that since the time that Inabnit purportedly made the statement, no other American-born manager had been hired by the Haag-Streit group. Inabnit also testified that he and his family "loved the [United] States," but that "sometimes we have surmised the feeling [that we are,] and sometimes I feel[,] discriminated [against]." He also expressed frustration at American laws: "We have to fill out forms. We have to mark something, we will not kill the president or whatever. And we are questioned. We are searched. I feel discriminated [against] by America." In a similar vein, Ott testified that it is a "very strange feeling" and "very, very hard" for him to be accused of retaliation and discrimination by Imwalle because he has to "defend [against] something I never committed."

## F.          Imwalle's termination

On January 27, 2004, three months after Imwalle filed his complaint of discrimination with the EEOC, Ott presented Imwalle with a termination letter stating that, effective immediately, Imwalle had been removed as President of Reliance and of HSH US.  Reliance gave notice in the letter of its intent not to renew Imwalle's employment agreement beyond June 18, 2004, the expiration of the then-current term of the agreement.  Until that time, the letter stated, Imwalle would remain an "employee" or "consultant" of Reliance with the sole responsibility of meeting once a week with HS USA President Dominick Beck to consult on matters of Beck's choice.

According to Human Resources Director Roy Grandstaff's notes, Ott began the January 27, 2004 meeting by reading the following written statement, which he had prepared in advance: "'Dennis, I know that you know that Haag-Streit (HS) never committed discrimination in the past, at present, and will not in the future.  I therefore canot [sic] understand why you raise such a claim.'  We are not discriminatory, just not."  At the end of the brief meeting, Imwalle handed over his office keys and company credit card.  He left the office that day and never returned.  Pursuant to the severance provisions in his employment agreement, Imwalle received his salary and benefits through August of 2004.

## G.          Procedural history

Imwalle filed suit in April of 2004 against Reliance; HSH US, Reliance's parent company; HSH AG, HSH US's parent company; and HS USA, Inc., a subsidiary of HSH US and affiliate of Reliance. (As previously noted, the foregoing companies are collectively referred to in this opinion as "Haag-Streit.")  He asserted nine claims relating to his allegations of age and national-origin discrimination and of retaliation.  After dismissing two claims on summary judgment, the district court submitted the rest to the jury.  After a five-day trial on the merits, the jury returned a verdict in favor of Imwalle on his retaliation claims and awarded him $185,000 in compensatory damages. The jury found for Haag-Streit on the claims of discrimination.

Haag-Streit then filed a motion for judgment as a matter of law on the retaliation claims, which the district court denied.  The district court also awarded attorney fees, costs, and prejudgment interest to Imwalle that totaled approximately $250,000.

Haag-Streit appeals the district court's denial of its motion for judgment as a matter of law and challenges the district court's award of attorney fees and costs.  It argues that Imwalle failed to establish a prima facie case of retaliation or prove that Haag-Streit's  proffered reason for terminating Imwalle was a pretext to hide retaliation.

## II.  ANALYSIS

## A.          Retaliation claim

### 1.          *Standard of review*

We review de novo a district court's denial of a motion for judgment as a matter of law. *United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1022 (6th Cir. 2003).  Judgment as a matter of law will be granted only where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).  The grant is appropriate only if, in viewing the evidence in the light most favorable to the nonmoving party, "reasonable minds could come to but one conclusion, in favor of the moving party." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001).  In reviewing the district court's decision, we may not "weigh the evidence, pass on the credibility of witnesses, or substitute

[our] judgment for that of the jury." *Toth v. Yoder Co.*, 749 F.2d 1190, 1194 (6th Cir. 1984); *see also Reeves*, 530 U.S. at 150.

### 2.    *Retaliation claims under Title VII, the ADEA, and Ohio state law*

Title VII forbids an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII.]." 42 U.S.C. § 2000e-3(a). Unlawful employment practices under Title VII include any actions taken on the basis of race, color, religion, sex, or national origin that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2.

The Age Discrimination in Employment Act (the ADEA) similarly prohibits an employer from "discriminat[ing] against any of his employees . . . because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this [Act]." 29 U.S.C. § 623(d). Section 4112.02(I) of the Ohio Revised Code likewise makes it unlawful for

> any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

A plaintiff in a Title VII or ADEA action may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation. *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004). Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (finding that the plaintiff's evidence was circumstantial where "it would not require the conclusion that defendant unlawfully retaliated against plaintiff; rather, one could draw that conclusion only by making a series of inferences" from plaintiff's evidence); *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 879 (6th Cir. 1991) (holding that the plaintiff had no need to prove pretext where she presented, and the factfinder believed, that her supervisors informed her and told others that their actions were taken in response to her protected activity).

In the present case, Imwalle did not present any direct evidence of retaliation, such as an explicit statement from Haag-Streit that it was firing him in response to his discrimination claims. He instead advanced a circumstantial case for retaliation.

When a plaintiff presents only circumstantial evidence, we examine Title VII, ADEA, and Ohio state-law retaliation claims under the same *McDonnell Douglas/Burdine* evidentiary framework that is used to assess claims of discrimination. *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to a retaliation claim); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) ("The *McDonnell Douglas/Burdine* formula is the evidentiary framework applicable not only to claims brought under Title VII, but also to claims under ADEA."); *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005) (holding that the ADEA analysis is applicable to state-law claims brought pursuant to Ohio's age-discrimination law).

The plaintiff has the initial burden under the *McDonnel Douglas/Burdine* framework to establish a prima facie case of retaliation by showing that (1) he engaged in protected activity, (2) this exercise of his protected civil rights was known to the defendant, (3) the defendant thereafter

took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action. *See EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997).

The burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for its actions once the plaintiff presents sufficient evidence to make out a prima facie case. *Avery Dennison*, 104 F.3d at 862 (citing *Burdine*, 450 U.S. at 253). If the defendant satisfies this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation. *Id.*

In order to prevail on a claim of retaliation where the defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must prove not only that the defendant's proffered reason was a pretext, but that the real reason for the employer's action was intentional retaliation. *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). The Supreme Court has held, however, that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). In *Reeves*, the Supreme Court explained that

> [p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. *See [St. Mary's*, 509 U.S.] at 517 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"). . . . Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Id.* at 147-48.

Applying the foregoing principles to a retaliation claim, this court has held that a plaintiff's prima facie case, combined with disbelief of the defendant's proffered reasons for the negative employment action, permits a finding of retaliation by the factfinder. *See Abbott*, 348 F.3d at 542 (citing *St. Mary's*, 509 U.S. at 511); *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997) (discussing the "import of the [*St. Mary's Honor Ctr. v.*] *Hicks* holding in this circuit"). The Supreme Court in *Reeves* held that "[o]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Reeves*, 530 U.S. at 147-48.

In *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), this court identified three ways in which a plaintiff may rebut a defendant's legitimate, nondiscriminatory reason and demonstrate pretext. The plaintiff may show that (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action. *Id.* Regardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (alteration in original). "The jury may not reject an employer's explanation . . . unless there is a sufficient basis *in the evidence* for doing so." *Manzer*, 29 F.3d at 1083 (holding that the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation) (emphasis in original).

Haag-Streit argues that it is entitled to judgment as a matter of law because Imwalle failed to establish a prima facie case. Both the Supreme Court and this court, however, have held that a party framing its argument on appeal in prima facie terms, after a jury trial on the merits, has "unnecessarily evaded the ultimate question of discrimination *vel non*." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983) (italics in original); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) ("Following a trial on the merits, the district court, therefore, cannot return to a consideration of whether plaintiff has proven its prima facie case. This is a preliminary matter which cannot be revisited at a later time.") Our duty at this stage of the proceedings is therefore to determine the ultimate question: whether Imwalle produced sufficient evidence to support the jury's finding that Haag-Streit terminated his employment in retaliation for his complaints of age and national-origin discrimination. *See Avery Dennison*, 104 F.3d at 862 ("The proper inquiry following the presentation of all evidence in a Title VII case is whether the plaintiff has proven its case by a preponderance under the *McDonnell Douglas-Burdine-St. Mary's* burden shifting framework.").

Accordingly, we "cannot simply hold that [Imwalle's] failure to provide evidence of an essential element of [his] prima facie case is dispositive here." *See Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 529 (6th Cir. 2005) (explaining the proper analysis where the defendant challenges the plaintiff's prima facie case of retaliation following a jury verdict). In reaching our determination on the ultimate question of retaliation, we may review "all of the evidence in the record," including the evidence supporting Imwalle's prima facie case. *See Reeves*, 530 U.S. at 150.

This is not to say, however, that a plaintiff's failure to present evidence sufficient to make out a prima facie case is irrelevant to our review of the ultimate question. *Gray*, 263 F.3d at 599 (addressing an alleged weakness in the plaintiff's prima facie case following a jury trial). Although Imwalle clearly produced evidence to support a finding that he engaged in protected activity, that the exercise of his civil rights was known to Haag-Streit, and that Haag-Streit took an adverse employment action against him by removing him as President of Reliance and terminating his employment agreement, the fourth prong of his prima facie case (establishing a causal connection) presents a closer question and is relevant to whether Imwalle is ultimately able to prove pretext.

### 3. *The ultimate question of retaliation*

Haag-Streit asserts that Inabnit and Ott terminated Imwalle for poor performance. Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment and, by articulating such a reason, Haag-Streit met its initial burden under the *McDonnell Douglas/Burdine* framework. The final burden therefore shifted to Imwalle to prove that Haag-Streit's stated reason for his termination was in fact a pretext designed to hide retaliation. *See Avery Dennison*, 104 F.3d at 862.

Imwalle takes the second *Manzer* approach by arguing that "[Haag-Streit's] claims of poor performance were simply not credible given the substantial evidence that proved otherwise." *See Manzer*, 29 F.3d at 1084. A plaintiff using the second approach must show that the proffered reason "did not actually motivate the defendant's challenged conduct." *Johnson*, 319 F.3d at 866 (internal quotation marks omitted). In this type of showing,

> the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of [retaliation] makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer*, 29 F.3d at 1084 (emphasis in original).

Imwalle introduced rebuttal evidence challenging Haag-Streit's proffered reasons in three ways. First, Imwalle offered evidence to show that Inabnit and Ott were satisfied with Imwalle's performance at Reliance and that, under Imwalle's leadership, Reliance was a profitable, well-run business for 14 years. Imwalle next presented evidence that he did not create, and was not responsible for, the problems at Moeller, and that, notwithstanding the foregoing, he in fact made every attempt to ameliorate the problems. Finally, Imwalle introduced other circumstantial evidence to show retaliation, including his own testimony that he experienced an "atmosphere of retaliation" following his first complaint of discrimination and a statement by Ott at the time of Imwalle's termination that reflected Ott's concern about the discrimination claims.

In evaluating Imwalle's rebuttal evidence, our analysis reaches the ultimate question of whether, when viewing the facts in the light most favorable to the plaintiff, Imwalle produced sufficient evidence for a reasonable jury to find that Haag-Streit's explanation for terminating Imwalle was pretextual, and that he was actually terminated in retaliation for his claims of age and national-origin discrimination. This is essentially a two-part showing, requiring a reasonable disbelief of Haag-Streit's poor-performance explanation coupled with circumstantial evidence showing that retaliation was more likely than not the motivation for Imwalle's termination. *See Kline*, 128 F.3d at 347; *Manzer*, 29 F.3d at 1084.

### a.          *Disbelief of Haag-Streit's explanation*

Haag-Streit argues that Inabnit and Ott were justified in terminating Imwalle for poor performance, and relies almost entirely on evidence of the inventory and accounting problems at Moeller. Imwalle, however, presented substantial evidence that Reliance was a very successful company under his watch and that he was not responsible for the Moeller problems. As to Reliance, Imwalle relied on testimony from Inabnit, Ott, Batterberry, and Grandstaff that, during Imwalle's 14-year tenure as President, Reliance was "always profitable," "a very successful part of the business," and "very well controlled." The company's best year, 2003, was not only Imwalle's last full year at Reliance, but was also the year in which Haag-Streit asserts that Inabnit and Ott decided to terminate Imwalle for poor performance.

Haag-Streit seeks to minimize the evidence of Reliance's success by pointing to the decrease in sales during part of 2001. Imwalle told Ott that the decline was due to a general economic recession. Ott rejected that explanation at the time and told Imwalle that he should have foreseen the recession and did not do enough to protect the Haag-Streit companies from its negative effects. Even assuming, as Haag-Streit asserts, that Imwalle's response to the recession was inadequate, the 2001 sales slump does not materially diminish Reliance's success during Imwalle's tenure. Sales decreased for only two months in 2001, and profits and sales rose for three consecutive years thereafter, eventually reaching a historic high in 2003.

Inabnit and Ott both testified that they were satisfied with Imwalle's performance as President of Reliance. Ott said that he had not "lost trust in [Imwalle's] ability to be president of Reliance Medical Products," and that he did not think that Imwalle had "failed in any way in his responsibilities." Even Ott's least-glowing assessment of Imwalle's performance is positive. He stated that Imwalle's performance was "good," but not "outrageous" or "outstanding" because "good means [that] it can be excellent," and that he was "happy with [Imwalle's performance], but one could do probably even more"—implying that there is always room for improvement. Ott also testified that, at the time of Imwalle's termination in January of 2004, Imwalle "was working like he did for . . . 14 years before." Inabnit testified that he, too, "never disputed that Dennis Imwalle was okay with Reliance."

As to Moeller, Imwalle presented evidence that the jury could have reasonably relied on to reject Haag-Streit's attempts to lay at his feet the blame for Moeller's accounting and inventory

problems. According to the evidence in the record, including testimony from the company's independent auditor Batterberry, Imwalle was not responsible for the persistent, and ultimately fatal, problems or for their effect on the rest of Haag-Streit's business. The problems at Moeller already existed when it was acquired by, and integrated into, Haag-Streit in 1990-1992, and Moeller was "virtually bankrupt" within two years—well before Imwalle was given any position of authority outside of Reliance in 1999.

In January of 2004, less than one week before Ott removed Imwalle as President of both Reliance and HSH US and relieved him of all operating responsibilities, HSH AG asked Batterberry for his opinion about the Moeller problems and who was to blame. Batterberry, whom Ott said he respected, stated that "the magnitude of the poor operating results of [Moeller] . . . is staggering for a business of its size." The heart of the problem, according to the auditors, was the way in which Moeller's "poor personnel" managed the business. Specifically, they did not employ "the same degree of care" in managing the Moeller inventory that employees at Reliance or other Haag-Streit divisions employed, they followed "a set of rules of [their] own making," and they did not follow "acceptable business practices" with respect to the company's operations. The most fundamental problem, however, was that the Moeller division "was never able to gain an acceptable level of sales in the US and has never had profitabl[e] financial results."

Batterberry singled out Ed Rae, then the vice president of sales at Moeller, as being primarily responsible for the continuing problems. In contrast, he complimented Imwalle for his efforts in trying to address the problems at Moeller. Batterberry wrote that the auditors "found it curious" that the Moeller problems did not exist elsewhere in Haag-Streit's U.S. operations, and repeatedly emphasized the "night and day comparison" of Moeller, which was plagued by problems, to Reliance, which operated effectively. Curiously, Ott later testified that Batterberry's letter was a "reconfirmation" of what he already knew the situation to be.

The evidence also shows that Imwalle had a limited role in managing the day-to-day business of Moeller, and that he never held any position at Moeller itself. Prior to 1999, Imwalle had no role whatsoever in HS USA or any of its divisions. In 1999, around the time that Imwalle was named VP and COO of HS USA, Inabnit issued a memorandum stating that Imwalle would be responsible for "long-term" and "general strategic recommendations" for HS USA and would serve on HS USA's administrative and operational "steering group" with three other individuals. Ed Rae remained responsible for Moeller's daily sales and operations and Inabnit retained ultimate decisionmaking authority.

Despite this, Batterberry testified that Imwalle and Edenfield, the CFO of HS USA, took "a lot of steps" and made "every attempt" to implement procedures and controls at Moeller that were already in place and were working effectively at Reliance and the other Haag-Streit companies. But the auditors pointed out that even these efforts were unsuccessful and "difficult to implement" because Moeller personnel were uncooperative and followed their own rules. HSH AG eventually realized that the problems at Moeller were insoluble. In mid-2003, Haag-Streit closed Moeller's operations—an action that Imwalle and others had recommended in 2002.

The independent auditor's testimony and his letter describing the source and nature of the Moeller problems seriously undermine the credibility of Haag-Streit's explanation that Imwalle was fired for poor performance in dealing with those problems. Based on the foregoing, the jury could have reasonably disbelieved Haag-Streit's explanation for terminating Imwalle.

### b.        *Evidence that retaliation was the real reason for Imwalle's termination*

To prove retaliation under the second prong of *Manzer*, Imwalle had to show that retaliation was a more likely motivation for his termination than poor performance. *See Manzer*,

29 F.3d at 1084. His evidence on this key issue is considerably weaker than his evidence supporting a disbelief of why he was purportedly fired.

As an initial matter, we note that Imwalle emphasizes the negative attitudes that Inabnit and Ott expressed toward elderly people and Americans. This evidence, to be sure, suggests that Inabnit and Ott may have harbored biases against Imwalle because of his age and national origin, and their own comments might even constitute direct evidence of discrimination. Indeed, based on such statements, Imwalle would appear to have a stronger case for discrimination than he does for retaliation. But the question of discrimination is not before us because the jury returned a verdict in favor of Haag-Streit on that issue. Instead, the question is one of *retaliation*. We therefore confine our review of the evidence to that which is relevant only to Imwalle's retaliation claim.

Imwalle testified at trial that he experienced "an atmosphere of retaliation" at Haag-Streit following his complaints of discrimination. He also stated that, between May of 2003 and January of 2004, he "was more or less divorced from the activities at Moeller Microsurgical [and] Haag-Streit USA . . . . ," and that he was excluded from key decisions, including the decision to finally close the Moeller operations in July or August of 2003.

But the jury also heard evidence suggesting that Imwalle was excluded from various business decisions before he complained of discrimination in May of 2003. Imwalle testified that he was "no longer participating in any of the Moeller meetings" prior to his first discrimination complaint. He also said that Ott had kept him "out of the loop" with regard to Moeller and HS USA since early 2003, and that he saw signs of an "approaching storm" by May of that year. Although this latter evidence weakens Imwalle's case for retaliation, the task of weighing the evidence belongs to the jury, which was entitled to believe Imwalle's testimony that Haag-Streit took retaliatory actions against him between May of 2003 and January of 2004. *See Toth v. Yoder Co.*, 749 F.2d 1190, 1194 (6th Cir. 1984) (explaining that, in reviewing a motion for judgment as a matter of law, the court "may not weigh the evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury").

In addition to the foregoing evidence of retaliatory conduct, Ott began the meeting at which he terminated Imwalle by reading to Imwalle a prepared statement that said: "Dennis, I know that you know that Haag-Streit (HS) never committed discrimination in the past, at present, and will not in the future. I therefore canot [sic] understand why you raise such a claim. We are not discriminatory, just not." Ott then told Imwalle that he was being immediately relieved of all further duties as President of Reliance and of HSH US. Viewing this evidence in a light most favorable to Imwalle, the fact that Ott made this statement about Imwalle's discrimination complaints at such a critical moment raises questions about Haag-Streit's true motivation for firing Imwalle.

On the one hand, the statement can be taken at face value, made solely for the purpose of assuring Imwalle that his firing had nothing to do with the alleged discrimination on the part of Haag-Streit because such discrimination purportedly did not exist. But another plausible explanation for Ott's statement is that Imwalle's discrimination claim had caused both frustration and resentment on the part of Haag-Streit, and that Ott's statement was designed to mislead Imwalle and discourage him from suing.

Ott obviously felt strongly enough about the accusations of discrimination to prepare a written statement and read it as the first order of business at the meeting he called to let Imwalle go. Furthermore, the timing of the statement, literally moments before Imwalle was notified that he was no longer President of Reliance or of HSH US and that his employment agreement was being terminated, clearly shows that Imwalle's complaint of discrimination was at the forefront of Ott's mind. How to evaluate Ott's statement was appropriately left for the jury to determine.

The timing of the termination is another factor that weighs in Imwalle's favor. This court has held that a causal connection for purposes of establishing a prima facie case of retaliation can be shown "through knowledge [of the complaints] coupled with a closeness in time that creates an inference of causation . . . . However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). In this circuit, a period of more than four months was found to be too long to support an inference of causation. *Cooper v. City of North Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that [plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an inference of retaliation"); *see also Parnell v. West*, No. 95-2131, 1997 U.S. App. LEXIS 12023, at *8 (6th Cir. May 21, 1997) (holding that "previous [6th Circuit] cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months").

Imwalle received Haag-Streit's termination letter on January 27, 2004, not quite three months after he filed his EEOC complaint on October 31, 2003. Thus, under our case law, the time between Imwalle's EEOC complaint of discrimination and his termination supports an inference of a causal connection.

Imwalle's testimony about the retaliatory atmosphere he experienced following his complaints, Ott's own statement at the January 2004 meeting, and the relatively short time between Imwalle's EEOC complaint and his removal as President—taken together and viewed in Imwalle's favor—support an inference of retaliation and satisfy the second part of the *Manzer* showing. *See Avery Dennison Corp.*, 104 F.3d at 861 ("[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity"); *Kline*, 128 F.3d at 347 (holding that a plaintiff's prima facie case, combined with substantial evidence supporting a reasonable disbelief of the employer's explanation, supports a jury finding of retaliation); *Manzer*, 29 F.3d at 1084 (explaining that, under the second approach to proving retaliation, a plaintiff shows that the "sheer weight of the circumstantial evidence of [retaliation] makes it 'more likely than not' that the employer's explanation is a pretext, or coverup").

Although we find the question to be a close one, the jury was ultimately entitled to make its own determination about the credibility of the evidence, including extensive trial testimony from both Imwalle and Ott. We therefore conclude that the totality of the evidence in the record, when viewed in the light most favorable to Imwalle, does not lead reasonable minds to but one conclusion in favor of Haag-Streit. Granting its motion for judgment as a matter of law is accordingly not appropriate and we decline to do so. *See Gray*, 263 F.3d at 598 (explaining that a motion for judgment as a matter of law "may be granted only if in viewing the evidence in the light most favorable to the non-moving party . . . reasonable minds could come to but one conclusion, in favor of the moving party").

## B.      Attorney fees, costs, and prejudgment interest

Following the jury's verdict in favor of Imwalle, he sought attorney fees, costs, and prejudgment interest. The district court set forth at length the proper legal standards to be applied in awarding attorney fees and costs and engaged in a detailed analysis of the amounts requested. In calculating the award, the court excluded 28.8 hours spent in unsuccessful settlement negotiations and several hours expended by attorneys who, the court concluded, were not sufficiently involved in the litigation to warrant the inclusion of their time.

The district court ultimately awarded Imwalle $233,186.50 in fees, $13,070.63 in costs, and $3,937.61 in prejudgment interest, for a total of $250,194.74. Haag-Streit argues on appeal that the court abused its discretion in making the award because (1) the paralegal's fees and expenses to

attend the depositions of Inabnit and Ott in Switzerland were unnecessary and unreasonable, (2) the billing descriptions were insufficient, and (3) Imwalle had only limited success on his various claims.

### 1.          *Standard of review*

We review a district court's award of attorney fees and costs for an abuse of discretion. *Singleton v. Smith*, 241 F.3d 534, 538 (6th Cir. 2001). The trial court's exercise of discretion is entitled to substantial deference because the rationale for the award is predominately fact-driven. *Wilson-Simmons v. Lake County Sheriff's Dep't*, 207 F.3d 818, 823 (6th Cir. 2000). This deference "is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). "A district court abuses its discretion when it relies upon clearly erroneous factual findings, applies the law improperly, or uses an erroneous legal standard." *Wikol v. Birmingham Pub. Schs. Bd. of Educ.*, 360 F.3d 604, 611 (6th Cir. 2004).

The starting point for determining the amount of a reasonable attorney fee is the "lodestar" amount, which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Hensley*, 461 U.S. at 433. Where the party seeking the attorney fees has established that the number of hours and the rate claimed are reasonable, the lodestar is presumed to be the reasonable fee to which counsel is entitled. *Pennsylvania v. Del. Valley Citizens Council for Clean Air*, 478 U.S. 546, 564 (1986). An award based on the total number of hours reasonably expended on the litigation might, however, result in an excessive amount if the claimant has achieved only partial success. *Hensley*, 461 U.S. at 435. In such cases, we must address two issues: (1) whether the claims on which the plaintiff failed to prevail were or were not related to the claims on which he or she succeeded, and (2) whether the plaintiff achieved a sufficient degree of success to render the hours reasonably expended a satisfactory basis for awarding attorney fees. *Id.* at 434.

Work on an unsuccessful claim cannot be considered to have been "expended in pursuit of the ultimate result achieved" where the plaintiff has presented distinctly different claims for relief based on different facts and legal theories. *Id.* at 435. But where the plaintiff's claims for relief involve common facts or related legal theories, such that much of counsel's time will have been devoted generally to the litigation as a whole, the court "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Id.* at 435.

The party applying for an award of fees should "exercise 'billing judgment' with respect to hours worked." *Id.* at 437. Attorneys who seek fees have an obligation "to maintain billing time records that are sufficiently detailed to enable courts to review the reasonableness of the hours expended" on the case. *Wooldridge v. Marlene Indus. Corp.*, 898 F.2d 1169, 1177 (6th Cir. 1990), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Resources*, 532 U.S. 598 (2001). We have explained that "[in] obtaining the number of hours expended on the case, the district court must conclude that the party seeking the award has sufficiently documented its claim." *United Slate, Local 307 v. G&M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 (6th Cir. 1984).

### 2.          *Paralegal fees and expenses*

In the present case, the district court determined that it was "reasonable for a paralegal to assist with the depositions." Haag-Streit challenges that finding on the basis that Imwalle's lead counsel, Randolph Freking, is "an experienced employment litigator who has taken dozens, if not hundreds, of depositions." But even the most experienced litigators might reasonably require the assistance of a paralegal in a case that involved nine claims and hundreds of exhibits, including

numerous company documents going back as many as 14 years. Moreover, no matter how experienced Freking is, he simply could not have known in advance how long the depositions would take or that only a few exhibits would actually be referred to. Neither Haag-Streit's argument nor any evidence in the record provides a basis to find that the district court's judgment regarding the paralegal's fees and expenses was clearly erroneous or an abuse of discretion.

### 3.    *Insufficient billing descriptions*

The district court also found that Imwalle's counsel "submitted documentation of sufficient detail and probative value to enable the [c]ourt to determine with a high degree of certainty that the remaining hours were actually and reasonably expended in the prosecution of the action." Haag-Streit argues, however, that descriptions contained in the billing statement of Imwalle's counsel were vague and failed to identify the general subject matter of the activity involved. Specifically, Haag-Streit points to entries such as "Conference with," "Research," "Review file," "Review documents," etc.

The key requirement for an award of attorney fees is that "[t]he documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *United Slate*, 732 F.2d at 502 n.2. Where the documentation is inadequate, the district court may reduce the award accordingly. *Hensley*, 461 U.S. at 433. Although counsel need not "record in great detail" each minute he or she spent on an item, *Wooldridge*, 898 F.2d at 1177 (quoting *Hensley*, 461 U.S. at 437 n.12), "the general subject matter should be identified." *Cleveland Area Bd. of Realtors v. City of Euclid*, 965 F. Supp. 1017, 1020 (N.D. Ohio 1997) (citing *Hensley*, 461 U.S. 424).

Courts in this circuit have reduced attorney fees on the basis of insufficient billing descriptions where the attorney did not "maintain contemporaneous records of his time or the nature of his work," *Keener v. Dep't of the Army*, No. 3-87-0647, 1991 U.S. Dist. LEXIS 4936 at *22 (M.D. Tenn. Feb. 8, 1991), *aff'd on decision of the district court by Keener v. Dep't of the Army*, No. 91-5442, 1992 U.S. App. LEXIS 2822 (6th Cir. Feb. 24, 1992), and where billing records "lumped" together time entries under one total so that it was "impossible to determine the amount of time spent on each task." *Cleveland Area Bd. of Realtors*, 965 F. Supp. at 1021. On the other hand, this court has upheld an award of attorney fees and found billing records to be adequate where entries made by counsel "were sufficient even if the description for each entry was not explicitly detailed," *McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005), and where the attorney provided the court with computerized calendars and file information indicating the dates and times of work performed. *Sigley v. Kuhn*, Nos. 98-3977/99-3531, 2000 U.S. App. LEXIS 1465 at *20-21 (6th Cir. Jan. 21, 2000); *see also Anderson v. Wilson,* 357 F. Supp. 2d 991, 999 (E.D. Ky. 2005) (holding that the plaintiffs had satisfied their burden to provide sufficiently detailed billing records where counsel provided the court with "itemized statements describing the subject matter, the attorney, the time allotment, and the charge for all work done on Plaintiffs' case").

This court held in *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991), that the party seeking fees has "the burden of providing for the court's perusal a particularized billing record." Once the prevailing party provides such a record, however, "conclusory allegations that the award was excessive and that . . . counsel employed poor billing judgment . . . do not suffice to establish that there was error . . . , particularly in light of the statements of the district court [explaining the award] and our standard of review."

Imwalle's counsel submitted 52 pages of detailed, itemized billing records that specify, for each entry, the date that the time was billed, the individual who billed the time, the fractional hours billed (in tenths of an hour), and the specific task completed. The time entries in counsel's billing

statement are listed separately and are not lumped together. Each page of the billing record contains a heading identifying the client, client matter number, and client matter description, and the billing statement appears to have been computer-generated. Furthermore, the billing records appear to have been maintained contemporaneously with the completion of the work and indicate the general nature of the tasks performed.

The billing statements document time billed beginning on March 30, 2004 and ending on May 21, 2006. This period of time corresponds to the dates on which the litigation commenced and Imwalle filed a request for attorney fees. The complaint was filed on April 20, 2004, less than a month after the first time entry, and Imwalle's motion for attorney fees, costs, and prejudgment interest was filed on May 23, 2006, two days after the last time entry.

Although some of the time entries in counsel's billing statement provide only the briefest description of the task completed, we have held that explicitly detailed descriptions are not required. *See McCombs*, 395 F.3d at 360. Counsel's billing entries, when read in the context of the billing statement as a whole and in conjunction with the timeline of the litigation, support the district court's determination that the hours charged were actually and reasonably expended in the prosecution of the litigation. *See United Slate*, 732 F.2d at 502.

### 4.     *Limited success*

Haag-Streit's final challenge to the fee award is its argument that the district court erred in not reducing the lodestar amount on the ground that "Imwalle achieved only limited success at trial, prevailing on only three of his nine claims and receiving compensatory damages less than one-fourth of his final settlement demand." Imwalle's complaint indeed sets forth nine claims: (1) national-origin discrimination in violation of Title VII, (2) national-origin discrimination in violation of Ohio Rev. Code Chapter 4112, (3) age discrimination in violation of the ADEA, (4) age discrimination in violation of Ohio Rev. Code Chapter 4112, (5) retaliation in violation of Title VII, (6) retaliation in violation of the ADEA, (7) retaliation in violation of Ohio Rev. Code Chapter 4112, (8) wrongful discharge in violation of Ohio public policy, and (9) breach of contract.

The district court granted Haag-Streit's motion for summary judgment with respect to Imwalle's public policy and breach of contract claims (claims 8 and 9). On the other hand, the jury returned a verdict in favor of Imwalle on his three claims of retaliation (claims 5-7), even though it found in favor of Haag-Streit on his discrimination claims (claims 1-4).

We have "repeatedly rejected mechanical reductions in fees based on the number of issues on which a plaintiff has prevailed." *Deja Vu of Nashville v. Metro Gov't of Nashville and Davidson County*, 421 F.3d 417, 423 (6th Cir. 2005). "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing the fee. The result is what matters." *DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 672 (6th Cir. 2006) (quoting *Hensley*, 461 U.S. at 435 (footnote omitted)).

"When claims are based on a common core of facts or are based on related legal theories, for the purpose of calculating attorneys fees they should not be treated as distinct claims, and the cost of litigating the related claims should not be reduced." *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1169 (6th Cir. 1996). The Supreme Court explained in *Hensley* that

> [m]any civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief

obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Hensley*, 461 U.S. at 435.

In *DiLaura*, we explained that, "[b]y focusing on the fact that most of plaintiffs' claims failed, the district court does what *Hensley* specifically forbids: it analyzes a series of related legal claims based on a common core of facts, and determines the amount of fees, not based on the plaintiffs' overall success, but based on the success or failure of the individual claims." 471 F.3d at 673. This court has in fact held that discrimination and retaliation claims are related for the purpose of awarding attorney fees. *Lilley v. BTM Corp.*, 958 F.2d 746, 756 (6th Cir. 1992) (holding that the district court could not properly reduce the attorney-fee award for time spent on the plaintiff's unsuccessful age-discrimination claim because it was related to the plaintiff's successful retaliation claim (citing *Hensley*, 461 U.S. at 437)).

Common facts are at the heart of all of Imwalle's claims, both successful and unsuccessful, as noted by the district court. Most importantly, there is a significant overlap in the legal theories underlying Imwalle's claims of discrimination and retaliation—all of which were decided by a jury following a trial on the merits. *See Jordan v. City of Cleveland*, 464 F.3d 584, 603 (6th Cir. 2006) (holding that, where there is "an obvious and significant legal overlap" between claims, full recovery for counsel's services is appropriate under *Hensley*).

The *McDonnell Douglas/Burdine* evidentiary framework, as noted in Part II.A.2 above, applies to claims of both discrimination and retaliation under Title VII and the ADEA. And Haag-Streit advanced the identical argument of poor performance in defense against Imwalle's unsuccessful claims of discrimination that it advanced in defense of his successful retaliation claims. In making the same argument in defense against seven of Imwalle's nine claims, Haag-Streit necessarily relied on the same facts.

Haag-Streit next argues that the lodestar amount should have been reduced because Imwalle sought a total of $800,000 in compensatory, punitive, and liquidated damages, but the jury awarded him only $185,000 in compensatory damages. It cites the Supreme Court's decision in *Farrar v. Hobby*, 506 U.S. 103 (1992), in support of its position. *Farrar*, however, is easily distinguishable from the present case due to the nominal amount of damages awarded to the plaintiff in that case. The Supreme Court reasoned as follows:

> In some circumstances, even a plaintiff who formally "prevails" under § 1988 should receive no attorney's fees at all. A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party. As we have held, a nominal damages award does render a plaintiff a prevailing party by allowing him to vindicate his "absolute" right to procedural due process through enforcement of a judgment against the defendant. In a civil rights suit for damages, however, the awarding of nominal damages also highlights the plaintiff's failure to prove actual, compensable injury. Whatever the constitutional basis for substantive liability, damages awarded in a § 1983 action must always be designed to compensate injuries caused by the [constitutional] deprivation. When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all.

*Farrar*, 506 U.S. at 115 (internal citations and quotation marks omitted).

But this case is not like *Farrar*. Imwalle received far more than "nominal" compensatory damages, which in *Farrar* totaled one dollar. *See Farrar*, 756 F.2d 1148, 1152 (5th Cir. 1985) (remanding the case to the district court with an order to award the plaintiff nominal damages "not

to exceed one dollar"). Here, Imwalle's $185,000 compensatory damages award was based on the jury's finding that he was discharged in retaliation for making claims of discrimination. Unlike the plaintiff in *Farrar*, Imwalle was able to prove an "actual, compensable injury." *See Farrar*, 506 U.S. at 115.

Haag-Streit's last argument is that "[o]nly the facts after May 22, 2003, when Imwalle first complained about any alleged discrimination, were related to his successful retaliation claims." This assertion is not only puzzling, but disingenuous. Haag-Streit itself argued that the decision to terminate Imwalle occurred *before* May 22, 2003 (when Imwalle's attorney sent the letter alleging age discrimination), and that Inabnit and Ott were justified in firing him due to the problems at Moeller and the Reliance sales slump in 2001, both of which occurred well before May 22, 2003. Indeed, *both* parties introduced substantial and highly relevant evidence predating May 22, 2003 in support of their respective positions.

In sum, none of Haag-Streit's arguments on the "limited success" issue have any merit. The district court therefore did not abuse its discretion when it declined to reduce the lodestar amount based on Imwalle's failure to prevail on all of his claims.

### III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the judgment of the district court.