Jeffrey LONGS, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

Case No. 2:07–cv–02653–JPM–cgc.

United States District Court,
W.D. Tennessee,
Western Division.

Aug. 10, 2009.

Venita Marie Martin, Andre B. Mathis, Glankler Brown, PLLC, Memphis, TN, for Plaintiff.

Stanley Eugene Graham, Kristy G. Offitt, Waller Lansden Dortch & Davis, Nashville, TN, for Defendant.

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

JON P. McCALLA, Chief Judge.

Before the Court is Defendant Ford Motor Company's ("Ford") Motion for Summary Judgment (D.E. 62), filed March 27, 2009. Plaintiff responded on April 28, 2009 (D.E. 65), and Ford replied on May 21, 2009 (D.E. 70). The Court held a telephonic hearing on Defendant's Motion on May 27, 2009. The attorneys present for Longs were Venita Marie Martin, Esq., and Andre B. Mathis, Esq. The attorneys present for Ford were Stanley E. Graham, Esq., and Kristy G. Offitt, Esq. For the reasons stated herein, Defendant's motion is GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

Longs began working for Ford Motor Company in 2001. (Pl.'s Resp. in Opp. to Mot. for Summ. J. ("Pl.'s Resp.") (D.E. 65) Ex. 1, Aff. of Jeffrey Longs ("Longs Aff.") ¶ 2.) He worked as a Parts Order Processor ("POP") at Ford's Memphis Distribution Center ("Memphis facility") from 2003 until his termination in July 2007. (*Id.*) As a POP, Longs was responsible for "picking" parts from shelves and routing them to dealers. (Def.'s Mot. for Summ. J. (D.E. 62) Ex. 7, Excerpts of Longs' Dep. ("Longs Dep.") 17:3–23.) He was a member of the United Autoworkers Union ("UAW" or "Union"). (Longs Aff. ¶ 3.)

### A. Production Goals

Pursuant to the Ford/UAW collective bargaining agreement ("CBA"), employees at the Memphis facility were given a production goal—a target number of orders each employee should pick per shift. (Def.'s Mot. for Summ. J. Ex. 6, Decl. of Kenneth Donaldson ("Donaldson Decl.") ¶ 5.) Employees who reached the production goal early were sometimes permitted to leave before the end of the shift. (*Id.* ¶ 6; Am. Compl. ¶ 16; Longs Aff. ¶ 22.)

Longs alleges that in January 2006, Sean McStravick, the Plant Operations Manager, unilaterally changed the production goal from 400 to 600 picks per shift. (Longs Aff. ¶ 11; Am. Compl. ¶ 16.)[1] According to Longs, his shift was racially balanced between African–American and

---

1. Ford denies this allegation. (Answer ¶ 16.) In its Motion to Strike, Ford argues that Longs fails to present any evidence to support his statements regarding what the production goals were or his assertion that McStravick unilaterally changed them. (Def.'s Mot. Strike Pl.'s Aff. (D.E. 71) 2.) The Court need not determine whether Plaintiff has met the personal knowledge requirement with respect to his statements about the production goals because this evidence is not necessary to rebut Longs' summary judgment motion.

Caucasian employees, but that there was an age disparity between the African–American and Caucasian employees such that older employees tended to be African–American, while younger employees tended to be Caucasian. (Longs Aff. ¶ 9.) Longs alleges that the production goal change adversely affected older African–American employees because younger Caucasian employees were routinely allowed to leave early while older African–American employees were not permitted to leave.[2] (*Id.* ¶ 9.)

### B. Internal Complaints

Between January and May 2006, Longs complained to his supervisor, Mike Waper; McStravick; union representatives; the Memphis Depot Manager; and Ford's Regional Manager that certain practices were discriminatory. (Longs Aff. ¶¶ 4–8.) For example, in January 2006, Longs complained to Waper that "it was discriminatory to allow certain employees to leave early while others had to remain at work. . . ." (*Id.* ¶ 4.) Although Longs explained in his affidavit that he was "referring to the fact that younger, white employees were being allowed to leave work early with pay while the older, black employees had to remain at work," he admitted that his complaints mention only discrimination generally and do not refer to race or age discrimination specifically. (Longs Dep. 127:11–14, 128:3–8, 183:4–10, 183:17–184:3; Longs Aff. ¶¶ 4–8.)

The record includes a document dated June 8, 2006, which appears to be a memorandum from Longs to Ford's Human Resources Department and to the Union. (Pl.'s Resp. Ex. 5 ("June Memorandum").) The memorandum details what Longs calls "Harassment, Age and Race Discrimination" from January 6, 2006 to May 31, 2006. (*Id.*) The record does not reflect whether this document was ever sent to Ford or to the Union.[3]

The record also includes a January 2006 grievance filed by the Union on behalf of a group of employees other than Longs. (Longs' Aff. Ex. 1, Union Grievance ("Union Grievance").)[4] The grievance alleged race and age discrimination. (*Id.*)

### C. Vacation Requests

From 2004 until 2007, vacation requests at Ford's Memphis Complex were generally granted on a first-come, first-served basis, based on the order of employees' signatures in a vacation request book. (Longs Dep. 107:2–17; Donaldson Decl. ¶ 7.) According to Kenneth Donaldson, a superintendent at Ford, the first three employees to request leave for a particular date were generally approved, but "super-

---

**2.** In its Motion to Strike, Ford argues that Longs offers "no specific dates, details or other evidence indicating the basis for his 'personal knowledge' that these employees left early." (Def.'s Mot. Strike Pl.'s Aff. 2.) Longs explained in his deposition, however, that his knowledge is based on what he personally observed at the end of his shifts. (Longs Dep. 129:16–20.) Longs' testimony about his personal observations is admissible.

**3.** Longs cites to the June Memorandum only once in his Response, offering it as support for his assertion that employees were permitted to leave early on May 26, 2006. (*See* Pl.'s Resp. 6.) The Court does not accept any of the statements in the memorandum as evidence

of the truth of the matters asserted. The contents of the document are hearsay statements if offered for their truth, and Longs has not argued that these statements fall within any exception to the hearsay rule. *See Smoot v. United Transp. Union,* 246 F.3d 633, 649 (6th Cir.2001) ("[I]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.")

**4.** In its Motion to Strike, Ford asserts that the Union Grievance is "inadmissible hearsay." (Def.'s Mot. to Strike 3.) In the absence of any explanation or argument in support of Ford's assertion, the Court declines to rule on the hearsay issue at this stage.

visors could recommend the approval of additional employees based on projected shift need or extenuating circumstances." (Donaldson Decl. ¶ 8.) Supervisors verbally informed the requesting employee whether a leave request was approved or denied. (Pl.'s Resp. Ex. 9, Excerpts of Dep. of Kenneth Donaldson ("Donaldson Dep.") 79:3–80:19, 95:14–20.)

McStravick took charge of the vacation book when he transferred to Longs' building in March 2006. (Longs Aff. ¶¶ 4, 26.) On May 3, 2006, Longs requested leave for May 26, 2006 to attend his daughter's graduation ceremony. (*Id.* ¶ 20.) Longs' name was listed eleventh in the vacation book for that date. (Pl.'s Resp. Ex. 3 ("Excused Vacation Day Listing, Week of 5/22/06").) According to Ford, Longs' leave request was denied because he was listed eleventh on the list. (Donaldson Dep. 92:17–22, 95:1–2.) At least five employees were approved for leave on that date, including some who were listed below Longs in the request book.[5] (Longs Aff. ¶ 21; *see also* Excused Vacation Day Listing, Week of 5/22/06; Donaldson Dep. 92:23–93:6.) An additional fifteen employees were permitted to leave early on that day. (Longs Aff. ¶ 22; *see also* Donaldson Dep. 95:3–13.)

## D. May 2006 Discipline

On May 29, 2006, Longs was disciplined for being late. (Am. Compl. ¶ 20; Answer to Am. Compl. ("Answer") (D.E. 15) ¶ 20.) Longs alleges that he was only two minutes late and that Ford had a seven minute grace period. (Am. Compl. ¶ 20.)

## E. July 2006 EEOC Charge

On July 14, 2006, Longs filed a Charge of Discrimination against Ford with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, age discrimination, and retaliation. (Longs Dep. Ex. 5, Charge of Discrimination ("July 2006 EEOC Charge"); Longs Aff. ¶ 24.) The charge asserted unfair disciplinary actions, wrongful denial of Longs' vacation leave on May 26, 2006, and unfair treatment. (*Id.*) Ford responded to the EEOC regarding Longs' charge on August 21, 2006. (Pl.'s Resp. Ex. 7, FMC August 21, 2006 Response to EEOC ("Ford EEOC Response").)

## F. Medical Fraud Discharge and Reinstatement

In September or October 2006, Longs injured his finger and was placed on light duty work restrictions. (Longs Aff. ¶ 27.) Longs continued to report to work as scheduled and was assigned to his regular duties. (*Id.*) Longs alleges that Ford hired a private investigator who observed him mowing his lawn. (*Id.* ¶ 28.) Longs was discharged for medical fraud on November 6, 2006. (Answer ¶ 23.) Following his termination, Longs filed a grievance with the Union. (Longs Aff. ¶ 29.) Longs denies Ford's accusations that he committed medical fraud. (Longs Dep. 144:19–24; Longs Aff. ¶ 30.)

On December 4, 2006, Longs signed a Reinstatement Waiver as a condition of reinstatement to his employment with Ford. (Def.'s Mot. for Summ. J. Ex. 4, Reinstatement Waiver; Longs Aff. ¶ 30;

---

**5.** Longs asserts that five employees were approved for leave for May 26, 2006. (Longs Aff. ¶ 21.) The Excused Vacation Day Listing, Week of 5/22/06 indicates that the following employees were approved for leave: (1) Melvin Griffin; (2) Gary Giles; (3) Scott Gilliam; (9) D. Franklin; and (12) Janice (last name illegible). Donaldson testified, however, that Tony Adams, who was listed thirteenth in the vacation book, was also approved for leave on May 26. (Donaldson Dep. 92:23–93:6.) Viewing the evidence in the light most favorable to Longs, therefore, two employees listed below him in the vacation book were approved for leave on May 26, 2006: Janice (12) and Tony Adams (13).

Longs Dep. 144:25–145:4.) The waiver provided that Longs could be terminated for any infraction in the next twelve months and denied Longs access to the grievance procedure to protest the reasonableness of disciplinary penalties during that time period. (Reinstatement Waiver.)

### G. March 2007 Discipline

Longs alleges that, following his reinstatement, McStravick and other managers began to closely monitor his work. (Longs Aff. ¶ 32.) Longs was counseled for three "replenishment error[s]" which occurred between March 7 and 15, 2007. (Longs Aff. ¶ 32; Longs Aff. Ex. 2, Error Reports) On March 26, 2007, the Union filed a grievance alleging that Ford unjustly disciplined Longs for errors he did not make. (*Id.* Ex. 4, Longs Union Grievance.)

### H. July 2007 Leave

In February 2007, Longs asked his then-supervisor, Don Bordes, if he could take vacation on Friday, July 13, 2007 and Monday, July 16, 2007 to attend a family reunion. (Longs Aff. ¶ 33.) In response, Bordes provided Longs with the vacation book, in which Longs claims to have written his name on the first line for both dates. (*Id.*) During the week of July 9, 2007, Longs went to examine the vacation book after learning from another employee that others were complaining that their names were no longer in the book. (*Id.* ¶ 34.) Longs noticed that his name did not appear in the vacation book for July 13 and 16, 2007—the dates for which he asserts his leave request had previously been approved. (*Id.* ¶¶ 34–36.)

When Longs asked McStravick for the book he had signed in February, McStravick responded that the vacation book on his desk was the only one. (*Id.* ¶ 34.) In response to Longs' complaint that he had already been approved for leave, McStravick told Longs to put his name in the book and "maybe [he] would be approved, maybe [he] would not." (*Id.* ¶ 35.) McStravick told Longs that he (McStravick) "could do whatever he wanted to do." (*Id.*) In the "new" book, Longs name was listed seventh for July 13 and fifth for July 16. (Longs Dep. Ex. 12 ("Excused Vacation Day Listing, Week of 7/9/07"), Ex. 13 ("Excused Vacation Day Listing, Week of 7/16/07").)

Longs does not know what happened to the pages he signed in February. (Longs Dep. 158:25–159:9.) Longs also submitted the unsworn statements of three employees who expressed confusion and concern over changes to the vacation book. (Pl.'s Resp. Ex. 8 ("Unsworn Employee Statements").)

Longs did not report to work on July 13 and 16, 2007 because, according to Longs, his supervisor had previously approved his leave request for those dates. (Longs Aff. ¶ 36.) Longs claims that the CBA does not allow Ford to rescind approved vacation leave without the employee's consent. (*Id.*) [6]

### I. EEOC Notice of Right to Sue

On July 13, 2007, the EEOC mailed a Dismissal and Notice of Rights letter ("Notice of Right to Sue" or "Notice") for Longs' July 2006 EEOC charge. (Pl.'s Resp. Ex. 6, July EEOC Notice) Longs states that he received the Notice at his home in Bartlett, Tennessee on Monday, July 16, 2007. (*Id.*) Da'Lana Holmes, a Human Resource Associate at Ford, states that she received the Notice on July 20, 2007, after the termination hearing and

---

**6.** Contrary to Ford's argument in its Motion to Strike, Longs filed the portion of the CBA which is the basis for his belief that the CBA does not permit Ford to rescind vacation time once it has been approved. (*See* Pl.'s Resp. Ex. 2, Vacation Leave Policy.)

that this was the first she learned of the EEOC charge. (Declaration of Da'Lana E. Holmes (D.E. 62–4) ("Holmes Decl.") ¶ 10.)

### J. Termination Decision

Holmes transferred to the Memphis Facility on July 9, 2007. (*Id.* ¶ 2.) She reviewed the attendance logs daily to determine which employees were absent or late. (*Id.* ¶ 3.) If she found an employee was absent without leave, Holmes was responsible for determining and imposing the proper disciplinary actions after considering factors such as prior attendance, disciplinary records, and whether the employee was subject to a waiver. (*Id.* ¶ 4.)

Holmes learned that Longs was absent on July 13 and 16, 2007 by reviewing the attendance logs. (*Id.* ¶ 5.) She asked McStravick whether Longs had requested leave, and McStravick responded that Longs' leave request had been denied. (Excerpts of Dep. of Sean McStravick (D.E. 62–9) ("McStravick Dep.") 51:6–52–5; Holmes Decl. ¶ 5.) Holmes then reviewed Longs' past attendance and disciplinary records and learned of his reinstatement agreement. (Holmes Decl. ¶ 6.) According to Holmes, absence without leave while on a reinstatement waiver is grounds for termination. (*Id.*)

Holmes scheduled a termination meeting for July 17, 18, or 19, 2007. (*Id.* ¶ 8; Longs Dep. 147:10–25.)[7] Present at the meeting were Longs, his union representative, Holmes, and McStravick. (Holmes Decl. ¶ 9; *see also* McStravick Dep. 101:3–15; Longs Aff. ¶ 37.) Holmes alleges that the July termination meeting was the first time she had met Longs. (Holmes Decl. ¶ 9.) According to Holmes, Longs admitted at the meeting that his supervisor did not confirm that Longs was approved for leave, and Longs did not provide a reasonable explanation for his absences. (*Id.* ¶ 9.) At the conclusion of the meeting, Holmes concluded that termination was the proper disciplinary action and informed Longs of her decision. (*Id.*)

Longs does not know which individual or individuals made the final decision to discharge him (Longs Dep. 59:7–9, 60:8–10), but he believes that Holmes and other members of the management team, including McStravick, were involved. (*Id.* at 58:15–60:10.)[8]

### K. After the Termination

On September 20, 2007, Longs filed a grievance with the National Labor Relations Board ("NLRB") alleging that Ford discharged him "to retaliate against him after he assumed the position of Recording Secretary for the UAW Local 30–06, the certified collective bargaining representative of bargaining unit employees." (Longs Dep. (D.E. 62–8) Ex. 3, NLRB Grievance.)

On October 5, 2007, Longs filed an EEOC charge, alleging that Ford retaliated against him for filing the July 2006 EEOC charge. (Longs Dep. (D.E. 62–8) Ex. 11; Longs Aff. ¶ 38.) Longs based his retaliation charge on the close temporal proximity between his receipt of the Right

---

**7.** Longs testified that the meeting was held on either July 17 or July 18 and that the meeting could not have been held on July 19 (Longs Dep. 147:15–17). According to Holmes, the termination meeting took place July 19, 2007. (Holmes Decl. ¶ 9.)

**8.** Longs testified that he believed McStravick recommended the termination decision be-

cause McStravick was present at the meeting and because Longs' union representative told him that McStravick recommended the discharge. (Longs Dep. 59:13–60:7.) McStravick's alleged statement to the union representative is hearsay and Longs has not argued that it fits within any hearsay exception. Accordingly, the Court will not consider this statement for the truth of the matter asserted.

to Sue Notice and his termination. (Longs Dep. Ex. 11, 2007 EEOC Charge.)

Longs filed the instant lawsuit on October 10, 2007 (D.E. 1), and amended his complaint on April 11, 2008 (D.E. 12). This case is set for trial on September 28, 2009.

## II. STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, and the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989). In considering a motion for summary judgment, however, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When confronted with a properly supported motion for summary judgment, the nonmoving party "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2); *see also Abeita v. TransAm. Mailings, Inc.,* 159 F.3d 246, 250 (6th Cir.1998). However, " '[t] he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.' " *Street v. J.C. Bradford & Co., Inc.,* 886 F.2d 1472, 1479 (6th Cir.1989) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## III. ANALYSIS

Longs brings the following claims: (A) discrimination in the form of disparate treatment on the basis of race [9]; (B) discrimination in the form of policies with a disparate impact on older African–American employees; and (C) retaliation. Ford moves for summary judgment on each claim. For the following reasons, the Court GRANTS Ford's Motion as to the discrimination claims and DENIES Ford's Motion as to the retaliation claim.

---

9. Longs' Response also refers to a disparate treatment claim based on age. The only age-based claim, however, is a disparate impact claim. Longs alleges that Ford discriminated against older employees in the assignment of tasks and performance of job duties and that Ford set "arbitrary quotas for production" which disparately impacted older employees. (Am. Compl. ¶¶ 31, 33.) While the assign-

ment of tasks and duties could, in some circumstances, be adverse employment actions, Longs' Response makes clear that the "reassignment" is his characterization of Ford's increased production quota: "Essentially, employees were 'reassigned' the responsibility of producing 600 lines, instead of the negotiated 400 lines." (Pl.'s Resp. 19.) This claim is addressed as a disparate impact claim.

## A. Race Discrimination: Disparate Treatment

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff may present direct evidence of race discrimination or may establish her case through circumstantial evidence using the *McDonnell Douglas* burden-shifting paradigm. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997), *reh'g and reh'g en banc denied; see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ Because Longs presents only circumstantial evidence to support his claims of discrimination, his claims are analyzed under the *McDonnell Douglas* framework. Under this framework, Plaintiff must first make out a prima facie case of discrimination by showing that (1) he is a member of a protected group; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4) similarly-situated non-protected employees were treated more favorably. *Kline*, 128 F.3d at 348; *see also McDonnell Douglas*, 411 U.S. at 803, 93 S.Ct. 1817.

Ford does not dispute that Longs is a member of a protected group and was qualified for his previous position at the Memphis Complex. Ford argues, however, that Longs did not suffer a materially adverse employment action and that Longs has not identified any similarly-situated employees outside the class who were treated more favorably. (Def.'s Mem. in Support of Mot. for Summ. J. ("Def.'s Support Mem.") 10–11.)

In his response, Longs points to the following adverse employment actions: the increased production goal (which Longs characterizes as a "reassignment" from the task of producing 400 lines to the responsibility of producing 600 lines) and modification of the vacation books. (Pl.'s Resp. 19–20.) In his complaint, Longs alleges that he was denied vacation and personal leave, subjected to scrutiny and harsher discipline, and given the "cold shoulder" by management because of his race.[10] (Am. Compl. ¶ 28.) The Court need not determine which, if any, of these alleged actions were materially adverse because Longs has not pointed to any similarly-situated employee outside the protected class who was treated more favorably.

■ The new production goals applied to each employee on Longs' shift regardless of race. Accordingly, the goals do not support a claim for disparate treatment based on race. Longs' claim that the policy had a disparate impact on older African–American employees is treated below as a disparate impact claim.

With respect to the vacation book, Longs asserts that "[t]he arbitrary and malicious modifications of the vacation and leave books were also aimed at African–American employees, adversely affecting work hours and benefits. . . ." (Pl.'s Resp. 19.) Longs does not point to evidence, however, to support his allegation that the modifications were aimed at African–American employees or that he was denied leave in July 2007 because of his race. He does not identify a single similarly situated non-African-American employee whose vacation requests were not altered, nor does he point to evidence that those employees who were granted vacation leave on his requested dates were not African–American. In the absence of evidence that employees whose names were allegedly removed from the books were

---

10. Longs does not allege or argue that his July 2007 termination was racially motivated.

disproportionately African–American, or other evidence that the modifications were motivated by racial animus, Longs has shown only that Ford's vacation policy may be unfair.

Similarly, Longs fails to present evidence that similarly situated non-African-American employees were treated more favorably with respect to the allegedly adverse actions listed in his complaint. He presents evidence that two employees listed below him in the vacation book for May 26, 2006 were approved for vacation that day, but he does not present evidence of their race(s). Of the three employees listed first and approved for leave on May 26, 2006, two are African–American (Melvin Griffin and Gary Giles) and one is Caucasian (Scott Gilliam). (Longs Dep. 115:7–17; Excused Vacation Day Listing, Week of 5/22/06.) Although Longs presents evidence that he was scrutinized by management by the use of a private investigator, he presents no evidence that non-African-American employees were not subjected to scrutiny when placed on medical work restrictions. In support, he points to discipline for arriving two minutes late and to multiple citations during March 2007. Although he asserts a general seven minute grace period, Longs fails to present any evidence of that policy or to identify a single similarly situated employee who was

not disciplined for being two minutes late. Finally, Longs does not point to similarly situated employees who were not similarly counseled or disciplined for the alleged replenishment errors in March 2007.[11]

For these reasons, Longs has failed to establish a prima facie case of race discrimination based on disparate treatment. As to his race discrimination claim, Ford's motion for summary judgment is GRANTED.

## B. Disparate Impact Claim

■ To establish a prima facie case of discrimination under a disparate impact theory, the plaintiff must (1) identify "a specific employment practice to be challenged; and (2) through relevant statistical analysis prove[ ] that the challenged practice has an adverse impact on a protected group." *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir.2005).[12]

The "relevant statistical analysis" requirement is not limited to any particular type or method, *Isabel*, 404 F.3d at 411–412 (*quoting Johnson v. U.S. Dept. of Health and Human Servs.*, 30 F.3d 45, 48 (6th Cir.1994) and *Teamsters v. United States*, 431 U.S. 324, 339–40, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)), but a "complete failure to make any such statistical showing is fatal. . . ." *Adams v. Lucent Tech.*,

11. The Court also notes that Longs does not present evidence that the March 2007 discipline was a "materially adverse change in the terms and conditions of employment" that was "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir.1999). The discipline was not a termination, demotion, decrease in wage or salary, change in title, material loss of benefits, or diminishment in responsibilities. *See id.*

12. Longs' disparate impact claim alleges both age and race discrimination and thus implicates both the Age Discrimination in Employment Act ("ADEA") and Title VII. For pur-

poses of this case, the differences between a disparate impact claim under the ADEA and under Title VII are immaterial. See *Butts v. McCullough*, 237 Fed.Appx. 1, 5–6 (6th Cir. 2007) (analyzing ADEA claim based on Title VII prima facie case for disparate impact, as articulated in *Isabel* ). "[T]he scope of disparate-impact liability under ADEA is narrower than under Title VII" because of the reasonable factors other than age ("RFOA") provision and because of the 1991 amendments to Title VII. *Smith v. City of Jackson*, 544 U.S. 228, 240, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005). Neither the RFOA provision nor the 1991 amendments are relevant to this case.

*Inc.,* 284 Fed.Appx. 296, 304 (6th Cir.2008) (quoting *Butts v. McCullough,* 237 Fed. Appx. 1, 9 (6th Cir.2007)).

Longs asserts that "arbitrary quotas for production" had a disparate impact on older African–American workers. (Am. Compl. ¶ 33; Pl.'s Resp. 19.) [13] Longs claims that the increased production goals and the policy of permitting employees who met the goals to leave early adversely affected older African–American workers, who generally did not finish early. (Longs Aff. ¶¶ 4–5, 9–10.) He also argues that older employees were disciplined for failing to work as quickly as younger employees. (Pl.'s Resp. 21.)

■ Longs has not provided any relevant statistical analysis to support his claim of disparate impact. Instead, he relies on his personal observations that younger Caucasian employees were permitted to go home, while older African–American employees remained at work until the end of the shift. He provides the Court with the following observations: his twenty to twenty-five person shift was racially balanced; the Caucasian employees on the shift were generally younger than the African–American employees; six younger Caucasian employees were routinely allowed to leave early; four older African–American employees were not permitted to leave early. (Longs Aff. ¶ 9.) In addition, Longs points to the grievance filed by the Union on behalf of several employees (other than Longs), expressing concern that these employees were being discriminated against based on race and age. (Union Grievance.) Some of the concerns expressed in this grievance related to discipline for underperformance. (*Id.*) Longs also relies on his own March 2007 disciplinary actions.

The Court does not find Longs' observations and anecdotal evidence sufficient to qualify as "relevant statistical analysis." *Compare Isabel,* 404 F.3d 404 (referring to the use of T-tests and Z-test as "statistical analyses" which could be used to show adverse impact) *with Craig v. Cont'l Pet Tech., Inc.,* 2006 WL 2792337, at *6 (E.D.Ky. Sept. 26, 2006) (finding that Plaintiff's reliance on testimony that practice affected only women was not statistical analysis). Accordingly, Longs has not satisfied the second element of his prima facie case that the increased production requirement had a disparate impact on older or African American employees and Ford is entitled to judgment as a matter of law on that claim.

As to Longs' disparate impact claim, Ford's motion for summary judgment is GRANTED.

**C. Retaliation**

Title VII makes it unlawful for an employer to "discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). Unlawful employment practices under Title VII include actions taken because of race, color, religion, sex or national origin that discriminate with respect to "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e–2, and employment practices that are facially neutral but have a disparate impact on a racial, religious, or other group protected under the statute, *Griggs v. Duke Power Co.,* 401

---

**13.** Although Longs does not explicitly include a claim for disparate impact based on race in his Amended Complaint, his Response indicates that the race discrimination claim in his complaint refers, in part, to an alleged disparate impact on African–American employees as a result of the increased production goals. (Pl.'s Resp. 19.)

U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Similarly, the ADEA makes it unlawful for an employer to "discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section ... or because such individual ... has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). Unlawful employment practices under the ADEA include actions taken because of an individual's age that discriminate with respect to the "compensation, terms, conditions, or privileges of employment," 29 U.S.C. § 623(a)(1), and some facially neutral employment practices that have a disparate impact on employees in a certain age group, *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005).

 In the absence of direct evidence of retaliation, courts analyze Title VII and ADEA retaliation claims at the summary judgment stage using the *McDonnell Douglas* burden-shifting framework. *Imwalle v. Reliance Medic. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir.2008). Under this framework, the plaintiff has the initial burden to establish a prima facie case of retaliation by showing: (1) he engaged in a protected activity; (2) defendant knew he engaged in the protected activity; (3) defendant subsequently took an adverse action against him; and (4) there was a causal connection between the protected activity and the adverse action. *Id.*

 Once the plaintiff presents sufficient evidence to establish his prima facie case, the burden then shifts to the employer to "produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* The plaintiff must then show that defendant's preferred reason for the adverse action was a pretext for intentional retaliation. *Id.*

#### i. Prima Facie Case

The parties disagree about which of Longs complaints qualify as protected activities under Title VII and the ADEA (element one), knowledge (element two), and causation (element four). There is no dispute that Longs' termination in July 2007 was an adverse employment action.

#### a. Protected Activities

The parties agree that Longs' formal EEOC charge in July 2006 was a protected activity, but disagree as to whether Longs' internal complaints between January and June 2006, including the June Memorandum, were protected activities under Title VII and the ADEA.[14]

"[A]n employee need not file a formal EEOC complaint to engage in protected activity...." *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir.2007). A "vague charge of discrimination in an internal letter or memorandum," however, "is insufficient to constitute opposition to an unlawful employment practice." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir.1989).

"Although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate that discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir.2006) (citations omitted). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a pro-

---

**14.** Although Longs does not specifically point to the June Memorandum as a protected activity, the Court understands his reference to "multiple complaints to management" to include the June Memorandum. (Pl.'s Resp. 12.)

tected class or providing facts sufficient to create that inference, is insufficient." *Id.; Tropp v. Ingalls Mem. Hosp.*, 2007 WL 869555, at *15 (N.D.Ill. March 21, 2007) ("[S]tatements that complain of discrimination generally, without the context of age, cannot constitute a protected activity."); *see also Offutt v. Warren County Reg'l Jail*, 109 Fed.Appx. 740, 743 (6th Cir.2004) (finding no protected activity under Title VII where employee "never indicated that her opposition was based on Title VII"); *Mikols v. Reed City Power Line Supply Co.*, 2008 WL 2696915, at *6 (W.D.Mich. July 1, 2008) (finding no protected activity where employee's general comments about "treating people equitably" did not "inform the employer that gender discrimination" was employee's concern); *Johnson v. Potter*, 2009 WL 368366, at *9 (W.D.Tenn. Feb. 12, 2009) (finding no protected activity where "there is no evidence in the record to reflect that [employee] complained to [employer] about unlawful discrimination on the basis of a protected characteristic").

Longs points to his "multiple complaints to management" and his July 2006 EEOC charge as protected activities.[15] (Pl.'s Resp. 12.) Ford argues, however, that Longs' internal complaints of discrimination were not protected conduct because Longs admits that he never specifically referenced race or age. (Def.'s Reply to Resp. to Mot. for Summ. J. (D.E. 70) ("Def.'s Reply") 1.) Longs explains that he was "referring to the fact that younger, white employees were being allowed to leave work early with pay while the older, black employees had to remain at work," but it is undisputed that his complaints mentioned only discrimination generally and not race or age specifically. (Longs Dep. 127:11–14, 128:3–8, 183:4–10, 183:17–

184:3; Longs Aff. ¶¶ 4–8.) Longs' general complaints of discrimination, which neither referred to a protected class nor provided facts sufficient to create that inference, are "insufficient to constitute opposition to an unlawful employment practice." *Booker*, 879 F.2d at 1313 (6th Cir.1989); *see Tomanovich*, 457 F.3d at 663. The Court concludes, therefore, that Longs' internal complaints to management between January and May 2006 were not protected activities under Title VII or the ADEA.

■ With respect to the June Memorandum, however, Longs has presented sufficient evidence that the letter was in opposition to unlawful employment practices under Title VII and the ADEA. The June Memorandum specifically references age discrimination, race discrimination, federal antidiscrimination laws, and the specific employment practice he alleged had a disparate impact on older and African–American employees. (June Memorandum.) Longs' specific opposition to practices based on their impact on racial and age groups is sufficient evidence that his June 2006 letter was a protected activity under Title VII and the ADEA.

Longs presents sufficient evidence that he engaged in two activities protected by Title VII and the ADEA: (1) the June Memorandum and (2) the July 2006 EEOC charge.

**b. Knowledge of the Protected Activities**

Ford argues that Longs cannot establish a prima facie case of retaliation because the sole decision-maker, Holmes, did not know of Longs' EEOC charge prior to the discharge. (Def.'s Support Mem. 5–6; Def.'s Reply 2.) In response, Longs argues that (a) a jury could infer that Holmes

---

**15.** Longs also relies on a union grievance filed by other workers on January 26, 2009. Because there is no evidence that Longs par-

ticipated or was involved in this grievance, it cannot be a protected activity for purposes of his retaliation claim.

received the EEOC Notice of Right to Sue before the termination (Pl.'s Resp. 9–10); and (b) even if Holmes did not know, Sean McStravick was also involved in the termination decision and knew of Longs' internal complaints. (Pl.'s Resp. 12–13.) The Court addresses each argument in turn.

### 1. Holmes' Knowledge

■ Based on the July 13 mailing date and Longs' testimony that he received the EEOC Notice of Right to Sue in Bartlett on July 16, there is a genuine issue of material fact as to whether Holmes received the letter in the days before Longs' termination. Furthermore, Holmes stated that she reviewed Longs' attendance and disciplinary records prior to the termination meeting. (Holmes Decl. ¶ 6.) Even if Holmes did not receive the EEOC Notice until July 20, a reasonable jury could conclude that Holmes' review of Longs' record would have revealed the June Memorandum or the July 2006 EEOC charge. Accordingly, there remains a genuine issue of material fact as to whether Holmes knew of Longs' EEOC complaint when Longs was terminated.

### 2. McStravick's Knowledge

Longs argues that evidence of Sean McStravick's knowledge of Longs' protected activities satisfies the second element of his prima facie case because McStravick was involved in the termination decision.

■ The Court agrees. A supervisor's knowledge and motives are relevant to the retaliation analysis if the supervisor "contributed significantly" to and was "meaningfully involved" in the termination decision. *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir.1995); *see also Arendale v. City of Memphis*, 519 F.3d 587, 604 n. 13 (6th Cir.2008) ("When an adverse . . . decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this

Court has held that the employer may be held liable under a 'rubber-stamp' . . . theory of liability."); *Nemet v. First Nat'l Bank of Ohio*, 198 F.3d 246, at *6 (table) (6th Cir.1999) (holding that employer may not shield itself from liability by having one manager make adverse decision in reliance on another manager's information without independent investigation).

■ It is undisputed that McStravick informed Holmes that Longs was not approved for leave on the relevant dates and that Holmes used that information in making the decision to terminate Longs. (Holmes Decl. ¶¶ 4–6; McStravick Dep. 51:6–52:5.) It is also undisputed that McStravick was present at the termination meeting. (Holmes Decl. ¶ 9; McStravick Dep. 101:3–5.) Viewing this evidence in the light most favorable to Longs, a reasonable jury could conclude that McStravick "contributed significantly" to and was "meaningfully involved" in the termination decision. Accordingly, Longs may satisfy the second element of his prima facie case by showing that McStravick knew of his protected activities at the time of his statements to Holmes, regardless of whether Holmes knew of the protected activities at the time of the termination decision.

McStravick's knowledge of the June 2006 letter or the July 2006 EEOC charge may be established with direct evidence or may be inferred from circumstantial evidence in the record. *Scott v. Eastman Chem. Co.*, 275 Fed.Appx. 466, 482 (6th Cir.2008). Longs argues that McStravick's position as his manager, combined with Longs' reference to McStravick in the EEOC charge, is sufficient circumstantial evidence from which a reasonable factfinder could infer that McStravick knew of the EEOC charge. (*See* Pl.'s Resp. 12–13.) Ford argues that Longs "proferred no evidence that McStravick was aware of his charge or any other of his alleged

protected activities" (Def.'s Reply 3), but Ford does not offer evidence that McStravick has denied knowledge of the protected activities. On the present record, there remains a genuine issue of material fact as to whether McStravick knew of Longs' protected activities. Accordingly, Ford is not entitled to summary judgment on that basis.

### c. Causation

Next, Ford argues that Longs cannot establish a prima facie case of retaliation because he cannot show a causal connection between his protected activities and July 2007 termination.

 When an adverse employment action occurs very close in time after the employer learns of a protected activity, temporal proximity alone may be enough to establish the causation element of the prima facie case. *Mickey v. Zeidler Tool and Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of the protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

### 1. Holmes

 With respect to Ms. Holmes' involvement in the termination decision, temporal proximity alone is sufficient to establish the causation element of Longs' prima facie case. If Ms. Holmes learned of the EEOC charge prior to the termination decision, she obtained that knowledge on July 16, 17, 18, or 19, 2007. Longs was terminated on July 17, 18, or 19, 2007. Viewing the evidence in the light most favorable to Longs, a reasonable jury could conclude that Holmes made the decision to terminate Longs within days or the same day she learned of the EEOC charge.

### 2. McStravick

 With respect to McStravick's involvement in the termination decision, temporal proximity alone is not sufficient to establish causation. Although Longs asserts that he complained and suffered subsequent retaliation for eighteen months (Pl.'s Resp. 13), the admissible evidence supports a conclusion that Longs complained informally from January to May 2006, that he sent a written complaint to Human Resources in June 2006, and that he filed an EEOC charge in July 2006.[16] (Longs Aff. ¶¶ 4, 6–8.) Longs points to no evidence that he engaged in any protected activity after July 14, 2006. Longs' termination on approximately July 17, 2007, more than one year later, is not close enough in time to establish causation based on temporal proximity alone. *See Hamilton v. Starcom Mediavest Group, Inc.,* 522 F.3d 623, 629 (6th Cir.2008) ("[P]roximity alone generally will not suffice where the adverse action occurs more than a few months—let alone nine months—after the protected conduct."); *see also Arendale,* 519 F.3d at 606–07 (two months between EEOC complaint and suspension insufficient, standing alone, to support causal connection); *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (four months between complaint and discharge insufficient, standing alone, to support inference of retaliation); *cf. Mickey,* 516 F.3d at 525–26 (adverse action on same day employer learned of protected activity sufficient for causation).

Similarly, the alleged alteration of the vacation book, which arguably led to Longs' eventual termination, was too remote in time to support a finding of causa-

---

**16.** Longs' second EEOC charge, filed October 5, 2007, came after his termination and can-

not be the protected activity for his retaliation claim.

tion based on temporal proximity alone. Viewing the evidence in the light most favorable to Longs, McStravick removed Longs' name from the vacation book in February 2007, seven months after Longs' July 2006 EEOC charge and eight months after the June Memorandum.[17] Standing alone this lapse in time does not support a finding that the vacation book was altered in retaliation for Longs' complaints.

■ Finally, Longs cannot rely on the close temporal proximity between Ford's receipt of his Right to Sue Letter and his termination to establish causation. While a defendant's receipt of a Right to Sue letter may be relevant to the causation inquiry if the defendant had no prior knowledge of the employee's protected conduct, issuance of a Right to Sue Letter is not itself a protected activity. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). Longs cannot argue that those involved in his termination decision did not have knowledge of his protected activities until they received the Right to Sue Letter. Such an argument would be inconsistent with his theory of "continuous" retaliation and his arguments that he was subjected to an "atmosphere of retaliatory conduct" for over a year leading up to his final termination. (Pl.'s Resp. 13–15.) Longs' theory that he was subjected to continuous retaliation for his protected activities requires a finding that someone involved in the termination decision knew of his protected activities before July 2007.

Furthermore, to establish the knowledge requirement of his prima facie case, Longs argues that McStravick knew of his "lengthy timeline of protected activity" and that McStravick was involved in the termination decision. (Pl.'s Resp. 12.) Longs

cannot also argue that those involved in the termination decision had no knowledge of his protected activities until Ford received the EEOC Notice of Right to Sue. As it related to McStravick's involvement in the termination, the timing between Ford's receipt of the EEOC Notice and Longs' termination is not evidence of causation.

Because Longs cannot establish causation based on temporal proximity alone, he must point to other evidence of retaliation to satisfy the causation element of his prima facie case. *See Mickey*, 516 F.3d at 525; *see also Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 718 (6th Cir.2007). Additional circumstantial evidence of retaliation could include, for example, evidence that the employer treated plaintiff differently than similarly situated employees who did not engage in protected activity (*see Barrett v. Whirlpool Corp.*, 556 F.3d 502, 517 (6th Cir.2009)), supervisor comments that reflect a retaliatory animus, (*Imwalle*, 515 F.3d at 549–50; *Harris v. Bornhorst*, 513 F.3d 503, 519–20 (6th Cir. 2008)), or evidence of increased scrutiny following the protected activity (*Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435–36 (6th Cir.2009)(*citing Jones v. Potter*, 488 F.3d 397, 408 (6th Cir.2007)).) Other evidence of retaliation could include "additional discrimination occurring between the date at which the employer learned of the protected activity and the date of termination. . . ." *Mickey*, 516 F.3d at 526.

Longs presents evidence that Ford subjected him to increased scrutiny and unearned discipline in the months following his complaints. Specifically, Ford hired a private investigator to watch Longs at home following a work injury in Septem-

---

**17.** Longs' testimony is sufficient evidence from which a reasonable jury could conclude that McStravick altered the vacation book sometime after February 2007, when Longs requested leave for July 13 and 16, 2007 from Don Bordes and wrote his name in the vacation book, and before July 2007, when Longs discovered the alleged alterations.

ber or October 2006 and monitored his work closely when he returned to work in December. (Longs Aff. ¶¶ 28, 32.) In November 2006, Ford terminated him for medical fraud, although Longs maintains that he did nothing wrong. (*Id.* ¶¶ 28–30.) In March 2007, Longs was cited repeatedly for errors he and the Union claimed he did not commit. (*Id.* ¶ 32; March Union Grievance.) Finally, Longs' testimony that he signed the vacation book in February 2007 and his name was not longer listed in July 2007 is evidence that Ford modified the vacation book such that his name was no longer listed first for July 13 and 16, 2007.

■ Taken together, and viewed in the light most favorable to Longs, the increased scrutiny, unjustified discipline, and unfair denial of vacation leave in the year between Longs' protected activities and his final termination is evidence that Ford may have harbored some retaliatory animus for Longs' protected activities. Accordingly, this evidence is sufficient to permit a reasonable jury to infer that Longs' termination in July 2007 was motivated by retaliation for his protected complaints.

### ii. Ford's Legitimate Non–Retaliatory Reason and Longs' Showing of Pretext

Ford points to Holmes' good faith belief that Longs was absent without leave while on a reinstatement waiver as its legitimate, non-retaliatory reason for terminating Longs. (Def.'s Support Mem. 8–9.) Ford argues that even if Holmes' belief was incorrect, Longs can establish only that his discharge was made in error, not that it was made with a retaliatory motive. (Def.'s Reply 4.)

■ The Court disagrees. The Court has already explained that a reasonable jury could find that McStravick substantially influenced the decision to terminate Longs by telling Holmes that Longs was

not approved for leave. Longs may establish pretext, therefore, by presenting sufficient evidence that *McStravick* did not honestly believe Longs was absent without leave. Longs has met this burden. According to Longs, he listed his name first in the vacation book for July 13 and 16, 2007 and Don Bordes approved his request. Longs presents evidence that the vacation book was subsequently altered or replaced and that McStravick was in charge of the vacation book during the relevant time period. He asserts that when he confronted McStravick about the missing vacation book and explained that he had already been approved for leave, McStravick replied that McStravick could "do whatever he wanted to do." (Longs Aff. ¶ 35.) Viewing this evidence in the light most favorable to Longs, a reasonable jury could conclude that McStravick did not believe in good faith that Longs was absent without leave and that McStravick was motivated by retaliatory animus when he told Holmes Longs was absent without leave. Combined with the potentially suspicious timing between Holmes' receipt of the EEOC Notice and the final termination, Longs has presented evidence that Ford's non-retaliatory reason for the termination was a mere pretext for intentional retaliation. *See DeBoer v. Musashi Auto Parts, Inc.,* 124 Fed.Appx. 387, 393 (6th Cir.2005) ("Suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence . . . .")

A genuine issue of material fact remains on the ultimate issue of whether Longs was terminated in retaliation for his protected activities. Accordingly, as to Longs' retaliation claim, Ford's motion for summary judgment is DENIED.

### IV. CONCLUSION

Ford's Motion for Summary Judgment is GRANTED IN PART and DENIED IN

PART. With respect to the discrimination claims, Ford's Motion is GRANTED. With respect to the retaliation claim, Ford's Motion is DENIED.