NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1122n.06

Nos. 11-2508 & 12-1067

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
**Oct 31, 2012**
DEBORAH S. HUNT, Clerk

AUTOMOTIVE SUPPORT GROUP, LLC, a )
Michigan limited liability company, dba ASG )
Renaissance, LLC, )
           )
    Plaintiff - Appellant, )
           )   ON APPEAL FROM THE UNITED
v. )   STATES DISTRICT COURT FOR
           )   THE EASTERN DISTRICT OF
DALE HIGHTOWER; DON RAY )   MICHIGAN
MCGOWAN, III, )
           )
    Defendants - Appellees. )

Before: GUY, DAUGHTREY, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge.  Automotive Support Group, LLC ("ASG") initiated

this action against former employees Dale Hightower and Don Ray McGowan for alleged breach of

contract, breach of fiduciary duty, and several related claims.  Hightower could not afford an

attorney, and the district court entered a default judgment against him.  McGowan filed an answer

and a counterclaim asserting breach of contract based on ASG's failure to pay him final wages and

severance.  McGowan then filed a motion for summary judgment on all pending claims, and the

district court granted the motion in two separate orders.  ASG appeals, and we now AFFIRM.

## I.  BACKGROUND

ASG is a professional services firm that specializes in marketing and human resource

outsourcing.  The company has its principal place of business in Farmington Hills, Michigan, and

does business also through a wholly-owned subsidiary, Blue Force Services, LLC.  Laurie Bradley

is the president of ASG and is responsible for sales and operations in the company's Human Capital Division, which focuses its efforts on contract staffing services. Under the contract staffing business model, ASG hires technical services employees and provides them on a contract basis to work in house or out of ASG offices for client companies.

Defendant Hightower worked with Bradley before either he or Bradley joined ASG. Bradley was President and Hightower was Vice President of Sales for a company called ThinkPath. Bradley left ThinkPath for ASG first, and in November 2004 she recruited Hightower to join her to help ASG move into government and defense industry contracting. ASG gave Hightower the title of Vice President of Sales, Government Operations and Business Development, and Hightower opened an ASG office in Charleston, South Carolina, with an eye on the defense business in South Carolina and Florida.

In January 2008, Hightower took the first actions that would lead to this lawsuit. He registered an Internet domain name and created a website for an entity called Staff Search & Rescue ("SSR"). At the time, Hightower did not attempt to incorporate SSR, hire any employees, or seek any business for SSR. In fact, Hightower later testified, SSR was never incorporated, never took in any funds, and never provided any financial benefit to anyone. As Hightower described it, the website was simply a placeholder that would allow him to someday think about starting a company.

In late 2008, ASG began to recruit technical writers to work out of the Charleston office for one of its defense industry clients, Force Protection, Inc. ("FPI"). Defendant McGowan was working in Cincinnati as a technical writer for Lockheed Martin at the time. After receiving an unsolicited phone call from ASG, McGowan moved to Charleston to work for Blue Force, ASG's wholly-owned subsidiary, as a technical writer on the FPI contract. McGowan signed an employment agreement

2

with ASG on November 4, 2008. The agreement contains noncompete language that forms the basis for ASG's claims against him:

> During the Restricted Period, Employee shall not directly or indirectly, on the Employee's behalf or on behalf of any other company, organization, individual or legal entity, solicit business from or perform services for any Customer or Potential Customer of ASG.

R. 31-7 at Page ID #435. The Restricted Period is defined as beginning with the date of the agreement and ending one year subsequent to termination or breach of the employment contract. The agreement also contains provisions protecting confidential information and requiring employees to devote their full time and attention to ASG and its clients.

The FPI contract for which ASG had hired McGowan was terminated in early 2009, and McGowan moved into a hybrid position on staff in Charleston, working largely on sales and development with Hightower as his supervisor. During the summer of 2009, Hightower directed McGowan to redesign the website for Blue Force. Satisfied with McGowan's work, Hightower asked or directed McGowan to redesign the website that Hightower had previously created for SSR. Hightower provided McGowan with all of the content for the website, and McGowan spent several hours over a weekend adding the content and changing the layout and color schemes. In September 2009, Hightower also asked McGowan to create a networking group for SSR on LinkedIn, a social networking website, and provided him with the content to do so.

At his deposition Hightower testified that when he asked McGowan for help on the website he told McGowan that SSR was only a placeholder and was not conducting any business. McGowan said that he had never heard of SSR before Hightower asked him to do the work and that he doubted at the time that SSR was a real entity. Hightower testified that he created an SSR email address for

3

McGowan because he wanted McGowan's help, but there is no evidence in the record that McGowan ever used the email address. In fact, Hightower testified that he had never invited McGowan to be a part of or to be involved with SSR, that he never asked McGowan to do anything more than redesign the website and create the LinkedIn account, and that he did not pay McGowan for the assistance he did receive.

After the FPI contract was terminated in early 2009, Bradley hoped that Hightower and his remaining employees could drum up new business for ASG and Blue Force. By October 2010, the new business had not materialized, however, and Bradley had to lay off several employees. McGowan and two other employees were kept on to work for Hightower. Around this time, Bradley began to have an uneasy feeling about the Charleston office. She suspected that when she called the office asking for Hightower she was being transferred to his cell phone, and when she visited the office for meetings she noticed glances between employees that she thought were out of the ordinary. She was perturbed by McGowan's failure to produce billable product for Raydon, a client company, and she came to the conclusion that the Charleston office had to be closed and the employees terminated because ASG was spending too much money with too little to show for it.

Sometime shortly before the office was closed, an ASG employee found SSR's LinkedIn account from Hightower's LinkedIn profile and brought it to Bradley's attention. The LinkedIn account identified McGowan as the account "owner." Bradley also testified that someone, though she could not remember who, brought to her attention an advertisement for SSR in the Charleston Business Journal. The telephone number for SSR in the advertisement was associated with Hightower's home address.

4

On December 8, 2010, Bradley traveled to Charleston to confront Hightower, and ASG flew McGowan to Michigan under the pretext of a performance review. McGowan was interviewed by ASG's human resource director, Lisa Speaks, and Vice President Rick Simon. Speaks advised McGowan that the Charleston office was being closed because business had not been as strong as ASG had hoped and that the remaining staff, including both Hightower and McGowan, were to be terminated that day. Simon then asked McGowan what he knew about SSR. McGowan said that he had completed the website at Hightower's request, but that he did not know anything else.

Speaks then presented McGowan with a severance agreement letter, which he signed. The letter committed ASG to a severance payment of $2500 in exchange for McGowan's waiver of any claims arising up to the date of the agreement. The letter also stated that McGowan's final paycheck would be dated December 24, 2010, and would provide his pay for the period December 6 to December 8, 2010.

In Charleston, Bradley interrogated Hightower about SSR before terminating him as well. Hightower told her that he had come up with the idea of SSR as a way to help his son, who had just graduated from high school, to earn some money. He told her, however, that SSR had not done any business, and he gave no indication that McGowan was involved.

Bradley had traveled to Charleston with ASG's Information Technology Manager Tim Watt. After Hightower and Bradley left the office that day, Watt spent two days dismantling the computer server and packing up the remaining items in the office to be sent to headquarters in Michigan. According to Speaks and Bradley, Watt placed items from each employee's desk in boxes labeled respectively with each employee's name, and then he drove the boxes back to Michigan in a van.

Within a couple of days of Watt's arrival in Michigan, Simon presented Bradley with a folder allegedly taken from the box labeled with McGowan's name. The folder was labeled "AAR/SSR" and inside were twenty-nine resumes printed in April 2010 from an internet job board and copied onto SSR letterhead. Hightower testified that the folder had been in or on his own desk at the office and that McGowan had never pulled any resumes or done any solicitation on the part of SSR. Hightower also admitted that he and his son Travis had downloaded the resumes and copied them onto letterhead, and Hightower pointed out that the notes taken on the resumes were in his own handwriting. Watt was not deposed during discovery, and Speaks stated that she had not spoken to Watt to confirm the folder had in fact come from McGowan's desk.[1]

ASG believed that the AAR on the folder referred to the Oklahoma-based AAR Aircraft Services, a long-time customer of ASG. Bradley instructed ASG staff to contact the individuals whose resumes were in the folder and that two of them claimed SSR had submitted their resumes to AAR. She also alleges that she called AAR's vice president, Dan Durning, who told her that some of AAR's recruiters had dealt with SSR, but that he didn't know whether any payment had ever been made. Bradley testified that when she first asked Durning to provide records for this suit, he told her, "Not a good way to keep a customer, Laurie." R. 31-4 at Page ID #403.

Durning did give Bradley the names of AAR staff she could contact to procure the records, but Bradley never followed up. Bradley never confirmed that AAR had in fact ever paid SSR for any services or that McGowan had ever contacted AAR on behalf of SSR, and no one from AAR

---

[1]In her affidavit, Bradley also testified that a folder entitled "SSR Invoices" was also found in McGowan's desk. In that folder, however, the invoice from the Charleston Regional Business Journal had Hightower's handwriting on it. None of the invoices appear to have mentioned McGowan by name, and in any case they were not entered into evidence.

was deposed for this litigation. Bradley made one other phone call to an ASG customer, Raydon, but her Raydon contact said he had not had any communication with SSR. Bradley acknowledged that she did not contact any other ASG customers or have any evidence that SSR had contacted other ASG customers.

Nonetheless, after finding the AAR/SSR folder, Bradley instructed the company's lawyer in Charleston to send McGowan a cease and desist letter stating that ASG had discovered that he had been operating a competing business out of the ASG offices. The letter, dated December 14, 2010, stated that McGowan had violated his employment agreement and therefore that ASG was withdrawing its offer of severance pay and would not make its final salary payment to him.

Subsequently, Bradley received more information tying Hightower to SSR. The phone number on an SSR brochure allegedly found at the Charleston office was the number belonging to Hightower's wife. On December 21, 2010, Bradley received a printout of a business networking website, Manta.com, which listed Hightower's home address as the address of the company and his wife's cell phone number as the company's number.[2] Two days later, Bradley intercepted a "Merry Christmas" email from an employee at AAR to Dale and Travis Hightower, identifying them as working for SSR. On January 3, 2011, ASG's attorney sent a cease and desist letter to Hightower.

In the final sequence of correspondence, ASG accused both Hightower and McGowan of failing to return three company laptops that had been delivered to the Charleston office. McGowan

---

[2]Speaks and a colleague found the Manta.com profile and other references to SSR while conducting an internet search in the week following Hightower's and McGowan's dismissal. It appears that during this search, the ASG employees also discovered a page on the SSR LinkedIn corporate group listing McGowan as the "Business Development Manager" for SSR. While the LinkedIn page was entered into the record as an exhibit in the court below, ASG entered none of the other sites into the record.

and Hightower both testified that McGowan had never been issued a laptop, however, and Speaks admitted she was not sure that McGowan was ever in possession of a laptop. ASG nonetheless reported the missing laptops to the police, but ASG never followed up, and the report was never acted on.

After his termination, McGowan applied for unemployment benefits. On December 20, 2010, the South Carolina claims adjudicator mailed ASG a determination that McGowan was eligible to receive benefits. ASG failed to appeal the decision within the ten-day appeals period and Speaks later advised the tribunal that "she felt it improper to file an appeal until all information was gathered regarding the claimant's separation." Decision of Appeal Tribunal, R. 32-7 at Page ID #547. On January 19, 2011, ASG belatedly appealed the determination, but the appeal was denied as untimely. McGowan was unemployed for several months before he eventually was hired on April 11, 2011 as a technical writer for Calgon Carbon Corporation in Pittsburgh, Pennsylvania.

## II. PROCEDURAL HISTORY

ASG initiated suit against Hightower and McGowan on January 21, 2011 in the United States District Court for the District of South Carolina. The case was transferred to the Eastern District of Michigan pursuant to McGowan's motion invoking the forum selection clause in the employment agreement. After the transfer, ASG filed an amended complaint against McGowan listing thirteen separate counts, including (1) Temporary Restraining Order / Preliminary and Permanent Injunction, (2) Breach of Contract / Breach of Covenant of Good Faith and Fair Dealing, (3) Breach of Fiduciary Duty / Duty of Loyalty, (4) Interference with Contractual and Business Relations, (5) Conversion, (6) Unjust Enrichment / Restitution, (7) Constructive Trust / Accounting, (8) Civil Conspiracy, (9) Declaratory Judgment [that Defendants forfeited any rights to receive severance pay] / Forfeiture,

8

(10) Declaratory Judgment [for the same reason] / Rescission, (11) Violation of the Michigan Uniform Trade Secrets Act, (12) Enforcement of Covenants Against Competition Pursuant to Statute [M.C.L. § 445.774a(1)], and (13) Unauthorized Access of a Protected Computer in violation of 18 U.S.C. § 1030(a)(4).

McGowan filed an answer and a counter-complaint against ASG, seeking $750 in unpaid final wages and $2500 in severance pay. In addition, McGowan requested treble damages and attorney's fees under § 41-10-80(C) of the Code of Laws of South Carolina. After discovery, ASG filed a motion for a default judgment as to Hightower, and McGowan filed a motion for summary judgment both on ASG's claims and on McGowan's counterclaims. After a hearing on October 20, 2011, the district court entered a default judgment against Hightower for $45,000 in damages. The court set that amount based on Bradley's testimony that Hightower was paid $90,000 per year and that she thought he had devoted only one half of his time to ASG during the final year of his employment. ASG asked the court to find that the judgment was based on intentional tort or fraud, but the court denied the request and noted dissatisfaction with the evidence ASG had presented in support of those claims.

On October 26, 2011, the district court also granted summary judgment to McGowan on all of ASG's claims, finding they were based on unsubstantiated suspicions and inadmissible hearsay. The court determined that each of ASG's thirteen counts was based either on the alleged breach of McGowan's employment agreement or on his alleged failure to return the laptops and proprietary data. The court found no evidence in the record to support the latter allegation. And the court held that McGowan's actions at his supervisor's request did not violate the terms of his employment agreement absent a showing of admissible evidence that he acted to promote an entity he *knew* was

9

competing with ASG. In the district court's estimation, the only admissible evidence implicated Hightower, not McGowan. In any case, the court noted, there was no evidence that Hightower's and McGowan's actions had caused injury to anyone.

In a separate order, the court granted summary judgment in McGowan's favor on his counterclaims, noting that ASG's defenses were based on theories of alleged breach the court had already rejected. Pursuant to the South Carolina statute and caselaw under which the counterclaim was brought, the court found no bona fide dispute as to whether ASG had been required to pay the wages and severance when originally due. Consequently, it granted McGowan's request for treble wage damages, attorney's fees, and reasonable costs. ASG filed a motion for reconsideration of McGowan's stated attorney's fee amount, and the court reduced the amount by $3,962. The final award to McGowan included $2500 in severance pay, $2250 in treble wages, $63,826.15 in attorney's fees, and $1,925.16 in costs.

ASG now appeals both the summary judgment order disposing of its claims against McGowan and the summary judgment order granting relief to McGowan on his counterclaim. ASG contests the district court's evidentiary decisions. It argues the court did not properly consider all thirteen counts in the complaint. And it maintains the court should have allowed the jury to determine whether the defendants' testimony was credible, whether McGowan breached his employment agreement, and whether ASG had a good faith basis to withhold McGowan's wages.

### III. DISCUSSION

**A. Standard of review**

This court reviews a district court's grant of summary judgment *de novo*. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Under Federal Rule of Civil Procedure 56(a), summary

judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The ultimate question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

A summary judgment opponent is obliged to "make her case with a showing of facts that can be established by evidence that will be admissible at trial." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citing Fed. R. Civ. P. 56(e)(2)). Thus, hearsay evidence cannot be considered in a motion for summary judgment. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). Likewise, this court has repeatedly emphasized that "unauthenticated documents do not meet the requirements of Rule 56(e)." *Alexander*, 576 F.3d at 558 (listing cases). A district court's hearsay determination on evidence proffered at summary judgment is reviewed *de novo*. *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003).

## B. ASG's claims against McGowan

In appealing the dismissal of its claims against McGowan, ASG focuses almost entirely on its contention that McGowan breached the noncompete provisions in his employment contract. In relevant part, McGowan's employment agreement prohibited him from "directly or indirectly . . . solicit[ing] business from or perform[ing] services for any Customer or Potential Customer of ASG." R. 435. Reviewing the record and considering evidentiary questions *de novo*, we find no genuine dispute of material fact as to whether McGowan violated this agreement.

As an initial matter, we note that neither Hightower nor McGowan admits that McGowan solicited ASG's customers or other entities. There is no deposition testimony or affidavit in the record from any ASG customer or potential customer to show that McGowan solicited business on behalf of SSR. And Bradley failed to undertake a reasonable investigation by which she could have confirmed or dispelled her suspicions about McGowan. Durning, the vice president of AAR, gave Bradley the names of individuals who could have provided her further information about the company's dealings with SSR, but Bradley never followed up with those individuals. She admits that her investigation led her to call only one other company, Raydon, and there she was told that Raydon employees had never heard of SSR.

The only evidence ASG musters in support of its claim that McGowan directly solicited ASG customers is the folder of resumes that Watt allegedly found on McGowan's desk. Bradley's allegation that the folder came from McGowan's desk, however, lacks personal knowledge and is not otherwise supported in the record. *See Moore v. Holbrook*, 2 F.3d 697, 699 (6th Cir. 1993) (noting that Fed. R. Civ. P. 56(e) requires that affidavits supporting a motion for summary judgment be based on personal knowledge). ASG did not depose Watt or include in the record an affidavit from him. And Speaks admits that she never even followed up to find out whether Watt in fact found the folder on McGowan's desk. The only competent evidence in the record about the folder is Hightower's testimony that he and his son produced and used the resumes, that the resumes contain Hightower's writing, and that Hightower left the folder on his own desk when the office was closed. In short, there is no genuine dispute as to the origins of the folder and therefore no genuine dispute as to whether McGowan directly solicited anyone on behalf of SSR.

12

Neither does ASG show any genuine dispute as to whether McGowan indirectly solicited customers for SSR in breach of his contract. A finding of indirect solicitation requires some evidence that McGowan was aware that SSR was an operating company and competing with ASG. Solicitation in this context is "an attempt or effort to gain business," Black's Law Dictionary 1520 (9th ed. 2009), which necessitates some expectation or knowledge that gaining business is an actual possibility. Hightower directed McGowan to redesign the SSR website and create the LinkedIn account but told him that SSR was a placeholder. McGowan testified that he doubted at the time that SSR was a real business, and there is no evidence in the record that McGowan had any knowledge of efforts by Hightower or his teenage son to solicit customers on behalf of SSR. The fact that McGowan redesigned the website over a weekend during the summer of 2009 and spent a very short time creating the LinkedIn account—both at his supervisor's request—does not create a genuine dispute of material fact as to whether McGowan indirectly solicited customers.[3]

While the parties appear to agree that Michigan law applies to ASG's claim for breach of contract, the Michigan cases ASG provides are inapposite. In *St. Clair Medical, P.C. v. Borgiel*, the defendant "readily admit[ted]" to providing services that would be barred by the agreement. 715 N.W.2d 914, 918 (Mich. Ct. App. 2006). McGowan, of course, has not done so. In *Radio One, Inc. v. Wooten*, the defendant argued that a noncompete agreement was unreasonable to the extent that it barred him from practicing his trade in a certain geographic area. 452 F. Supp. 2d 754, 758 (E.D. Mich. 2006). Here, McGowan does not contest the validity of his employment agreement. The only

---

[3]To the extent that ASG makes the argument, we do not consider whether the specific language in the LinkedIn account suggests McGowan breached his contract. In his motion for summary judgment, McGowan argued that the printouts of the LinkedIn account were inadmissible hearsay, and ASG did not contest the argument. The question is thus not preserved for appeal. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008).

issue before the court is whether ASG provided sufficient competent evidence to create a genuine dispute of fact as to whether McGowan breached the agreement. ASG has not.

ASG also presses its civil conspiracy claim on appeal, attempting to impose responsibility for Hightower's actions on McGowan. The conspiracy claim, however, fails for much the same reason as did the breach of contract claim. ASG has provided no admissible evidence that McGowan had the tortious intent necessary to make out a claim of civil conspiracy under Michigan law. An essential component of a civil conspiracy claim is that "each particular defendant who is to be charged with responsibility shall be proceeding tortiously, which is to say with intent to commit the tort or with negligence." *Rosenberg v. Rosenberg Bros. Special Account*, 351 N.W.2d 563, 569 (Mich. Ct. App. 1984) (quoting W. Prosser, *Law of Torts* § 46, at 292 (4th ed. 1971)). In other words, "[o]ne who innocently does an act which furthers the tortious purpose of another is not acting in concert with him." *Id.* If ASG cannot prove at least constructive knowledge on McGowan's part that SSR was or would be a going concern, then the record cannot support a finding of tortious intent.

In addition, "the core of an actionable civil conspiracy is a question of damages." *Fenestra Inc. v. Gulf Am. Land Corp.*, 141 N.W.2d 36, 48 (Mich. 1966). ASG's explanation of damages is largely limited to Bradley's speculation. Based on Durning's "not a good way to keep a customer" statement to her, Bradley speculates that ASG lost goodwill with AAR and potentially lost future contracts, all due to Hightower's actions. This argument is not based on McGowan's improper diversion of business from ASG, but on Bradley's unsuccessful efforts to draw AAR into her dispute with Hightower. More importantly, Durning's statement is inadmissible hearsay. And there is no evidence in the record—admissible or not—that SSR ever received payment from any other party

14

for services rendered, much less from a customer or even potential customer of ASG. For all these reasons, the civil conspiracy claim fails.

Finally, while ASG complains that the district court dismissed its other eleven counts without careful consideration, the company's briefing on appeal is limited to the breach of contract and civil conspiracy claims. The briefs provide no argument regarding the remaining claims. This court applies the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (internal quotation marks and citation omitted).

In sum, ASG has provided no basis for disturbing the grant of summary judgment for McGowan on ASG's claims against him. Summary judgment may be appropriate when the case of the nonmoving party rests merely upon "unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). We therefore affirm the district court's summary judgment order as to ASG's claims against McGowan.

## C. McGowan's wage and severance counterclaim

The district court granted summary judgment to McGowan on his claim for $750 in unpaid wages and for the $2500 he was owed under the severance agreement. In addition, citing South Carolina Code of Laws § 41-10-80(C), the court granted McGowan attorney's fees, costs, and treble damages on his wage claim. Section 41-10-80(C) provides, in relevant part:

> In case of any failure to pay wages due to an employee as required by Section 41-10-40 or 41-10-50 the employee may recover in a civil action an amount equal to three times the full amount of the unpaid wages, plus costs and reasonable attorney's fees as the court may allow.

§ 41-10-80(C). The court's application of this language raised the unpaid wages portion of the judgment to $2250, in addition to $2500 in severance pay, and provided the basis for assessing $65,751.31 in fees and costs.

The parties agree that McGowan's counterclaim for unpaid wages and severance pay is intertwined with ASG's direct claims for breach of contract and breach of fiduciary duty. ASG argues that an employer may not be liable for back wages or severance where the former employee breached his duty of loyalty. *See, e.g.*, *Futch v. McAllister Towing of Georgetown, Inc.*, 518 S.E.2d 591, 594 (S.C. 1999) ("[A]n employee who breaches the common law duty of loyalty to an employer . . . forfeits the right to compensation.").[4] But this argument is foreclosed where, as here, the court has already rejected the direct claims of breach by the employee.

ASG also argues that severance pay is not covered by § 41-10-10 and therefore that McGowan has no legal basis to claim it. The district court, however, did not award severance pay pursuant to the statute, as evidenced by the exclusion of the severance pay from the calculation of treble damages. The severance pay is due to McGowan under a common law breach of contract theory based on the letter agreement itself. Recognizing this, ASG argues in the alternative that the severance letter amounted only to "a gratuitous offer." This argument is specious. McGowan provided consideration by waiving his right to bring a variety of legal claims. The letter represented a valid agreement, and McGowan is thus due both his final $750 in wages and $2500 in severance pay.

---

[4]While the employment agreement specifies the application of Michigan law to disputes, ASG does not contest McGowan's claim that he may seek relief for alleged violations of South Carolina employment statutes.

16

Finally, ASG appeals the grant of treble damages on McGowan's wage claim and the grant of attorney's fees and costs pursuant to § 41-10-80(C). McGowan argues that South Carolina law requires this court to review the trial court's decision to grant treble damages and attorney's fees under an abuse of discretion standard. The question is surprisingly complex, which perhaps explains ASG's failure to articulate a counter-argument.[5] In any case, even reviewing the district court's determination *de novo*, we agree that McGowan is due treble wages and fees and costs under the statute.

Interpreting § 41-10-80(C), South Carolina courts have held that treble damages are permissive rather than mandatory where there is a "good faith dispute over wages allegedly due." *Rice v. Multimedia, Inc.,* 456 S.E.2d 381, 383 (S.C. 1995). "[A] finding that an employee is entitled to recover unpaid wages is not equivalent to a finding that there existed no bona fide dispute as to the employee's entitlement to those wages." *O'Neal v. Intermedical Hosp. of S.C.*, 585 S.E.2d 526, 531–32 (S.C. 2003). Thus, even if a plaintiff ultimately prevails, a court may decline to impose treble damages and attorney's fees when the issue involved a "valid close question of law or fact which should properly be decided by the courts." *Rice*, 456 S.E.2d at 383.

---

[5]State rules governing attorney fee awards are generally considered to be substantive law and therefore apply in federal court diversity actions under the *Erie* doctrine. *See Acwoo Intern. Steel Corp. v. Toko Kaiun Kaish, Ltd.*, 840 F.2d 1284, 1291 (6th Cir. 1988). *Cf. Scottsdale Ins. Co. v. Tolliver*, 636 F.3d 1273, 1279 (10th Cir. 2011) (distinguishing substantive and procedural fees). However, the standard of review to be applied to fee awards is generally considered to be procedural and therefore is "likely governed by federal law." *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 983 (8th Cir. 2010). *But cf. Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1448 (2010) (Stevens, J., concurring) ("[T]here are some state procedural rules that federal courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies."). And while we generally review the decision to award attorney's fees and the amount of those fees under an abuse of discretion standard, "any elements of legal analysis and statutory interpretation which figure in the district court's decision are reviewable *de novo*." *Hall v. Bolger*, 768 F.2d 1148, 1150 (9th Cir. 1985).

The "relevant date for determining whether the employer reasonably withheld wages is the time at which the wages were withheld, i.e. when the employer allegedly violated the Act." *Mathis v. Brown & Brown of S.C., Inc.*, 698 S.E.2d 773, 782 (S.C. 2010). According to the severance agreement, it appears that ASG was required to pay McGowan his final wages by December 24, 2010. The issue is whether a good faith dispute existed on that date.

Bradley and ASG may have suspected or even believed on December 24 that McGowan had violated his contract. But even a reasonable suspicion or belief does not necessarily create a "valid close question of law or fact." *Rice*, 456 S.E.2d at 383. At the outset, we note that McGowan's admission that he redesigned the SSR website and created the LinkedIn page cannot form the basis of a bona fide dispute given that ASG knew McGowan had done so before it promised payment of his final wages and severance. ASG's argument that the court should consider hearsay or other inadmissible evidence for the purpose of this determination also fails. To the extent the authority ASG cites is to the contrary, we disagree. *See Moore v. Sears, Roebuck & Co.,* 683 F.2d 1321, 1322–23 (11th Cir. 1982) (holding otherwise inadmissible evidence supporting employer's good faith in a wrongful discharge claim was not hearsay). Without admissible evidence to support its suspicion, ASG should have known that no close question of law or fact existed for a court to decide. Moreover, ASG tacitly admitted as much by failing to timely appeal McGowan's unemployment benefits decision by December 30, 2010. The stated basis for ASG's failure to appeal was the lack of a sufficiently complete record at the time. While this admission may not be dispositive, it certainly indicates ASG's position that the company did not have sufficient evidence of McGowan's breach to proceed in court at the time it owed and refused to pay his wages.

18

The district court carefully parsed the record and found no bona fide dispute as to whether ASG owed McGowan his final wages. We have independently taken the same steps and come to the same conclusion. It was not reasonable for ASG to withhold McGowan's final wages solely on the basis of Bradley's suspicion, particularly in light of Bradley's concurrent failure to carry out the kind of investigation that could have either confirmed or dispelled her concerns. Thus, whether considered *de novo* or under an abuse of discretion standard, we affirm the determination of the district court that treble damages and attorney's fees are appropriate in this case.

The standard of review for the *amount* of the attorney's fees awarded is abuse of discretion. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008). ASG highlights the lower fee awards in other South Carolina wage cases and contends that the award here was excessive. But ASG provides no statutory authority or constitutional theory to support this argument, and ASG cannot dispute that its complex defense to the wage counterclaim required significant research and briefing on McGowan's part. The court below reviewed ASG's motion for reconsideration and reduced the award where appropriate. We find no abuse of discretion.

## IV. CONCLUSION

For the reasons stated above, we AFFIRM both orders of the district court.